## UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| COLE SEBALD, derivatively on behalf of MGP INGREDIENTS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> DAVID COLO, DAVID S. BRATCHER, BRANDON M. GALL, NEHA J. CLARK, THOMAS A. GERKE, DONN LUX, PREET H. MICHELSON, LORI L.S. MINGUS, KEVIN S. RAUCKMAN, KAREN L. SEABERG, TODD B. SIWAK, <br><br> Defendants, <br><br> and <br><br> MGP INGREDIENTS, INC., <br><br> Nominal Defendant. | Civil Action No. <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Cole Sebald ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant MGP Ingredients, Inc. ("MGP" or the "Company"), files this Verified Shareholder Derivative Complaint against David Colo ("Colo"), David S. Bratcher ("Bratcher"), Brandon M. Gall ("Gall"), Neha J. Clark ("Clark"), Thomas A. Gerke ("Gerke"), Donn Lux ("Lux"), Preet H. Michelson ("Michelson"), Lori L.S. Mingus ("Mingus"), Kevin S. Rauckman ("Rauckman"), Karen L. Seaberg ("Seaberg"), and Todd B. Siwak ("Siwak") (collectively, the "Individual Defendants," and together with MGP, the "Defendants") for breaches of their fiduciary duties as controlling shareholders, directors and/or officers of MGP, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of

1

Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and for contribution against Defendants Colo, Bratcher, and Gall under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MGP, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by MGP's current and former directors and officers from May 4, 2023 through October 31, 2024, both dates inclusive (the "Relevant Period").

2.      MGP, headquartered in Atchison, Kansas, produces, distills, and distributes alcoholic beverages. Among the kinds of alcohol produced by MGP are tequila, bourbon, rye, vodka, and gin.

3.      As the result of the COVID-19 pandemic and stay at home mandates, consumers around the world increased their consumption of alcohol. Within the United States alone, there was a significant increase in retail sales of alcohol in 2020, with some studies suggesting as much as 25% of people consumed more alcohol than they had prior to the pandemic.

4.      As a result of this uptick in drinking, companies who sold alcoholic beverages, such as MGP, benefitted considerably throughout the pandemic. In order to meet this bump in demand,

the Company began to increase its production. However, eventually demand would return to normal levels and, in 2023, the Company saw demand began to do so.

5.      Throughout the Relevant Period, the Individual Defendants caused MGP to make false and misleading statements about its level of inventory having been "sold through" prior to this decline in consumer demand. For example, on May 4, 2023, the Company issued a press release announcing its financial results for the first quarter of the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), which the Company also filed with the SEC on Form 8-K (the "Q1 2023 Earnings Release").

6.      That same day, the Company hosted an earnings call with investors to discuss the first quarter result (the "Q1 2023 Earnings Call"). On the Q1 2023 Earnings Call, Defendant Colo said of the Company's demand:

> Thanks, Brandon. We are pleased with the solid results delivered this quarter, despite increased costs and broader macroeconomic uncertainty. ***Demand for our products in each of our three segments remains strong and we believe our business continues to be well positioned***. We expect to maintain a high level of operational execution and remain deliberate in our actions, as we navigate the market dynamics this year, which is why we are reconfirming our full year fiscal 2023 guidance.[1]

7.      The truth fully emerged on October 31, 2024, when the Company issued a press release announcing its third quarter financial results for the fiscal year ended December 31, 2024 (the "2024 Fiscal Year"), which the Company also filed with the SEC on Form 8-K (the "Q3 2024 Earnings Release"). The Q3 2024 Earnings Release revealed that, as the result of ""the softening American whiskey category trends and elevated industry-wide barrel inventories," the Company needed to "further lower our net aging whiskey put away, scale down our whiskey production, and optimize our cost structure to mitigate lower production volumes."

---

[1] All emphasis added unless stated otherwise.

8.      On an earnings call with investors that same day (the "Q3 2024 Earnings Call"), Defendant Bratcher admitted that "slower growth and **_higher inventories_** are leading to lower demand, lower prices and reduced visibility on our contract distilling sales." Defendant Gall then added that as a result, the Company was "significantly reducing our brown goods production to **_better align with demand in 2025_**. At the same time, softer American whiskey growth and elevated barrel inventories continue to constrain demand for aged whiskey and increasingly our new distillate."

9.      On this news, the price per share of MGP stock fell $8.27, or 14.7%, from closing at a price of $56.31 per share on October 30, 2024, to close at a price of $49.04 per share on October 31, 2024.

10.     Throughout the Relevant Period, in breach of their fiduciary duties owed to MGP, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, _inter alia_, that: (1) despite their claims, the Individual Defendants did not have a good sense as to the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an Equity Incentive Plan (the "2024 Incentive Plan"); and (5) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

4

11.    The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

12.    In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing MGP to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between March 2024 and July 2024, approximately 128,360 shares of MGP common stock were repurchased at artificially inflated prices, costing the Company approximately $10 million. As the Company's stock was actually worth only $49.04 per share, the price at which it was trading when markets closed on October 31, 2024, the Company overpaid for repurchases of its own stock by approximately $3.7 million in total.

13.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while three of the Individual Defendants engaged in improper insider sales, netting total proceeds of approximately $14.2 million.

14.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

15.    In light of the Individual Defendants' misconduct—which has subjected the Company, two of its former President/Chief Executive Officers ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to

the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Colo's, Defendant Bratcher's, and Defendant Gall's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because

MGP is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of MGP. Plaintiff has continuously held shares of MGP common stock since first purchasing on April 11, 2022.

### Nominal Defendant MGP

22.     MGP is a Kansas corporation with principal executive offices at 100 Commercial Street, Atchison, Kansas, 66002.  MGP common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "MGP."

### Defendant Colo

23.     Defendant Colo served as the Company's President, CEO, and as a Company director from May 2020 until December 2023.

24.     The proxy statement that the Company filed with the SEC on April 12, 2023 (the "2023 Proxy Statement") stated the following about Defendant Colo:

> Mr. Colo has been the Company's Chief Executive Officer since May 2020 and the President since March 2020. He also served as the Company's Chief Operating Officer from March 2020 to May 2020. Prior to joining the Company, he served as President, Chief Executive Officer and a director of SunOpta, Inc., a leading global company focused on natural food, ingredient sourcing, organic food, and specialty foods, from February 2017 to March 2019. He served as Executive Vice President and Chief Operating Officer of Diamond Foods, Inc. from 2013 until March 2016. He joined Diamond Foods in 2012 as Executive Vice President of Global Operations and Supply Chain. For the three years prior to joining Diamond Foods, Mr. Colo served as an independent industry consultant, focusing on organizational optimization and planning. From 2003 to 2005, he served as President of ConAgra Food Ingredients. Before his employment at ConAgra Foods, Mr. Colo spent several years with Nestle-Purina Pet Care Company in roles of increasing

responsibility, including Vice President of Supply for the company's Golden Products Division and Vice President of Store Brands and Venture Development. He also served two years as President of the American Dehydrated Onion and Garlic Association. Mr. Colo's qualifications to serve on the Board include his extensive management experience and his experience in the food industry, and the insights he brings from his service as an officer of the Company.

### Defendant Bratcher

25.    Defendant Bratcher served as the Company's President, CEO, and as a Company director from January 2024 until December 2024. Prior to becoming CEO, Defendant Bratcher served as the Company's Chief Operating Officer from July 2021 until December 2023.

26.    The proxy statement that the Company filed with the SEC on April 9, 2024 (the "2024 Proxy Statement") stated the following about Defendant Bratcher:

Mr. Bratcher is our Chief Executive Officer and President, a role he assumed on January 1, 2024. Mr. Bratcher served as our Chief Operating Officer from July 2021 to December 2023, and as President of Branded Spirits since our merger with Luxco, Inc. in April 2021 to December 2023. Prior to the Luxco merger, Mr. Bratcher served in several leadership roles at Luxco since his hire in 1998 as Director of Operations. He most recently served as President of Luxco, from 2013 until the April 2021 merger with Luxco. Before joining Luxco, Mr. Bratcher served in financial and operational roles for a number of consumer product companies, including serving five years as Controller and then Director of Operations for the international spirits company Allied Domecq, the second-largest spirits company in the world at the time. Mr. Bratcher's qualifications to serve on our Board include his extensive leadership experience and his experience in the beverage and alcohol industry, and the insights into our operations, management, and culture he brings from his service as our Chief Executive Officer and President.

### Defendant Gall

27.    Defendant Gall has served as the Vice President of Finance and CFO since April 2019. As of January 1, 2025, Defendant Gall also has been serving as the interim President and CEO of the Company.

28.     The "Executive Team" page of the Company's website[2] stated the following about

Defendant Gall:

> Brandon Gall is Vice President of Finance and Chief Financial Officer of MGP and
> has served in this role since April 2019. In this role, Mr. Gall oversees the
> Company's accounting, business development, financial planning and analysis,
> treasury, investor relations, tax, and IT functions. Mr. Gall joined the Company in
> 2012 and has advanced through a steady progression of leadership roles, including
> Director of Financial Planning and Analysis, Director of Supply Chain Finance,
> Director of Business Development, and Corporate Controller.
>
> Prior to joining MGP, Mr. Gall worked at Errand Solutions, Chicago as director of
> finance and human resources. From 2005 to 2010, Mr. Gall served at Credit Suisse
> Securities in various analyst and associate roles and earned numerous securities
> licenses including the Series 7, Series 63 and Series 66 licenses.
>
> Mr. Gall holds a bachelor's degree of business administration from Miami
> University and a master's degree in business administration from the University of
> Chicago. He is also a certified public accountant.

**Defendant Clark**

29.     Defendant Clark has served as a Company director since June 2021. She also serves

as the Chair of the Audit Committee, and as a member of the Human Resources and Compensation

Committee (the "Compensation Committee") and the Nominating and Governance Committee.

30.     The 2024 Proxy Statement stated the following about Defendant Clark:

> Ms. Clark has been the Senior Vice President of Enterprise Finance at Brunswick
> Corporation (NYSE:BC), a leading global designer, manufacturer, and marketer
> of recreational marine products, since May 2022. She served as the Chief Financial
> Officer of Brunswick Boat Group, a division of Brunswick Corporation, from
> March 2019 to May 2022. From August 2018 to November 2018, she was the
> Chief Financial Officer of Lifeway Foods, Inc., a manufacturer and marketer of
> beverages and dairy products. From January 2016 to August 2018, she was the
> Chief Financial Officer – Coveris North American Food & Consumer Flexibles /
> Chief Transformation Officer of Coveris Americas, a leading producer of flexible
> packaging. From 1999 to 2015, she was employed by Kraft Foods, with increasing
> levels of responsibility, most recently as Director of Finance – Grocery Business.
> From 1997 to 1999, she was a senior auditor with Grant Thornton LLP. Ms.

---

[2] https://ir.mgpingredients.com/company-information/executive-team

Clark's qualifications to serve on our Board include her significant financial, accounting, and public company leadership experience.

**Defendant Gerke**

31.     Defendant Gerke has served as a Company director since June 2021. He also serves as the Chair of the Compensation Committee, and as a member of the Audit Committee and the Nominating and Governance Committee.

32.     The 2024 Proxy Statement stated the following about Defendant Gerke:

Mr. Gerke served as the General Counsel and Chief Administrative Officer at H&R Block Inc. (NYSE: HRB), a global consumer tax services provider, from January 2012 until January 2022 and as a Senior Vice President at H&R Block until his retirement in September 2022. He served in additional roles during his tenure at H&R Block, including Interim Chief Executive Officer and leader of the human resources function. From January 2011 to April 2011, Mr. Gerke served as Executive Vice President, General Counsel and Secretary of YRC Worldwide, a transportation service provider. From July 2009 to December 2010, Mr. Gerke served as Executive Vice Chairman of CenturyLink, an integrated communications business. From December 2007 to June 2009, he served as President and CEO at Embarq, an integrated communications business. He also held the position of Executive Vice President and General Counsel – Law and External Affairs at Embarq from May 2006 to December 2007. From October 1994 to May 2006, Mr. Gerke held a number of executive and legal positions with Sprint, serving as Executive Vice President and General Counsel for over two years. Mr. Gerke currently serves as a board member of Consolidated Communications Holdings, Inc. (Nasdaq:CNSL), a leading broadband and business communications provider. He was a member of the board of directors of Tallgrass Energy GP, LLC, which is the general partner of Tallgrass Energy, LP, from August 2015 to April 2020. He is also a past member of the boards of directors of CenturyLink, Embarq, the United States Telecom Association, the Rockhurst University Board of Trustees, and The Greater Kansas City Local Investment Commission Board of Trustees. Mr. Gerke's qualifications to serve on our Board include his legal and regulatory experience, his strong human resources background, and his experience on the boards and as an executive for public companies.

**Defendant Lux**

33.     Defendant Lux has served as a Company director since June 2021. Since January 2024, he also serves as the Chairman of the Board. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Lux beneficially owned 7,963,169 shares of the Company's common

stock, which represents 36.2% of all shares of Company common stock, making Defendant Lux the controlling shareholder over matters voted on by common stock shareholders.

34.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Lux made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
| --- | --- | --- | --- |
| May 10, 2023 | 10,000 | $83.00 | $829,970 |
| May 13, 2023 | 22,000 | $82.84 | $1,822,567 |
| June 9, 2023 | 2,005 | $101.69 | $203,888 |
| June 12, 2023 | 8,000 | $101.56 | $812,480 |
| May 14, 2024 | 20,000 | $82.30 | $1,645,980 |
| May 15, 2024 | 15,000 | $81.90 | $1,228,470 |

Thus, in total, before the fraud was exposed, Defendant Lux sold 77,005 shares of Company stock on inside information, for which he received approximately $6.5 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

35.    The 2024 Proxy Statement stated the following about Defendant Gerke:

Mr. Lux served as President and Chief Executive Officer of Luxco, Inc., from 1991 until March 2021, and as Chairman, from 2010 until March 2021, of Luxco, a leading branded beverage and alcohol company that we merged with in April 2021. Mr. Lux has served on the boards of the American Distilled Products Association and The National Alcohol Beverage Control Association ("NABCA") Industry Advisory Committee, and he currently serves on the board of the St. Louis Regional Business Council. His philanthropic activities include serving on the boards of Social Venture Partners of St. Louis, the University City Children's Lume Institute, the St. Louis Legacy Ice Foundation, the St. Louis Blues for Kids, and the Lux Family Foundation. Additionally, Mr. Lux is an avid pilot and donates time piloting his Pilatus PC-12 aircraft in support of the Veterans Airlift Command and Angel

Flight Central. Mr. Lux's qualifications to serve on our Board include his leadership skills, his extensive expertise and experience in the beverage alcohol industry, his former role as Chief Executive Officer of Luxco, and his management of the growth and development of multi-brand beverage and alcohol portfolios.

**Defendant Michelson**

36.     Defendant Michelson has served as a Company director since May 2022. She also serves as a member of the Audit Committee, Compensation Committee, and Nominating and Governance Committee.

37.     The 2024 Proxy Statement stated the following about Defendant Michelson:

Ms. Michelson has been Chief People Officer at tms, a Havi Company, since December 2023. tms is a privately-owned company that unites technology, marketing, and sourcing to deliver change to leading brands. Previously, she was Vice President of Human Resources at CVS Health Corporation (NYSE: CVS), an American healthcare company, from November 2022 to December 2023. From March 2022 to November 2022, she was the Chief People Officer of AHEAD, Inc., a digital business platform builder. From June 2019 to March 2022, she was employed by United Airlines as Managing Director of HR for the President, Chief Human Resources Officer and Chief Customer Officer. From December 2015 to June 2019, she worked for Molson Coors Beverage Company, in several positions of increasing responsibility, including as Senior HR Commercial Lead for MillerCoors. From 2012 to 2015, she was Vice President, Customer Experience & Organizational Effectiveness of The Y of Metropolitan Chicago. Prior to that, she was employed by Beam Global Spirits & Wine from 2010 to 2012 as Director, Marketing Strategy. From 2005 to 2009, she served as Senior Manager, Strategy—Tropicana Beverages, of PepsiCo. From 2000 to 2005, she served as Director, Strategy, Planning & Analysis for the Chicago Tribune Company. From 1999 to 2000, she worked for Ernst & Young LLP as a Manager in its Mergers and Acquisitions practice group. Ms. Michelson's qualifications to serve on our Board include her background in strategy and marketing for multiple consumer brands, her extensive experience in all aspects of human resources management, her alcohol beverage industry experience, and her leadership experience.

**Defendant Mingus**

38.     Defendant Mingus has served as a Company director since June 2020. She also serves as a member of the Compensation Committee and the Nominating and Governance Committee.

39.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mingus made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| May 25, 2023 | 608 | $99.71 | $60,624.00 |
| May 26, 2023 | 400 | $97.34 | $38,937.00 |
| May 30, 2023 | 3,692 | $94.92 | $350,437.00 |
| June 9, 2023 | 1,096 | $101.06 | $110,761.00 |
| July 3, 2023 | 2,268 | $106.61 | $241,780.00 |
| August 1, 2023 | 320 | $112.62 | $36,038.00 |
| August 2, 2023 | 324 | $113.19 | $36,673.00 |
| August 8, 2023 | 1,215 | $122.17 | $148,436.00 |
| September 1, 2023 | 591 | $120.32 | $71,109.00 |
| October 2, 2023 | 383 | $104.69 | $40,096.00 |
| November 1, 2023 | 108 | $93.92 | $10,143.00 |
| December 4, 2023 | 1,061 | $90.63 | $96,158.00 |
| January 2, 2024 | 354 | $99.21 | $35,120.00 |
| February 15, 2024 | 113 | $90.00 | $10,170.00 |
| May 22, 2024 | 2,430 | $78.88 | $191,678.00 |
| August 23, 2024 | 2,764 | $90.46 | $250,031.00 |
| September 4, 2024 | 100 | $90.02 | $9,002.00 |

Thus, in total, before the fraud was exposed, Defendant Mingus sold 17,827 shares of Company stock on inside information, for which she received approximately $1.7 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material

misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

40.    The 2024 Proxy Statement stated the following about Defendant Mingus:

Ms. Mingus is a principal and owner of Torpa Design Co., a company specializing in all facets of graphic design, interior design, and exterior design, a position she has held since 2005. Her career began in graphic design in 1996, and she has worked as a designer for public companies, national associations, and an advertising agency. Ms. Mingus serves as a trustee on the Evah C. Cray Historical Museum and as a board member on the Cray Medical Research Organization at the University of Kansas Medical Center. In addition, she serves as a board member on the Atchison Amelia Earhart Foundation. Ms. Mingus's qualifications to serve on our Board include her business and civic experience and organizational skills, her knowledge of the Company and the industries in which we operate, and her familiarity with the community where we are headquartered. Ms. Mingus is the daughter of Ms. Seaberg.

**Defendant Rauckman**

41.    Defendant Rauckman has served as a Company director since June 2020. He also serves as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee and the Compensation Committee.

42.    The 2024 Proxy Statement stated the following about Defendant Rauckman:

Mr. Rauckman owns and is a financial consultant at Rauckman Advisors, LLC, where he has worked since November 2017. Mr. Rauckman served as the Chief Financial Officer and Treasurer of Garmin Ltd. (Nasdaq: GRMN) from January 1999 to December 2014 before taking early retirement from that role. He was named CFO of the Year by the Kansas City Business Journal in 2008. Mr. Rauckman currently serves as a board member and the Audit Committee Chairman of CrossFirst Bankshares, Inc. (Nasdaq: CFB), in a role he has held since May 2016. He has also served as a board member and Audit Committee Chairman of JE Dunn Construction Group, a privately held corporation, since January 2017. Mr. Rauckman's qualifications to serve on our Board include his experience on the boards of other companies and his significant financial, corporate governance, leadership, operational, and strategic planning skills.

**Defendant Seaberg**

43.     Defendant Seaberg has served as a Company director since August 2009. She also serves as a member of the Compensation Committee and the Nominating and Governance Committee. She also served as the Chair of the Board from 2014 through December 2024. According to the 2024 Proxy Statement, as of March 25, 2024, Defendant Seaberg beneficially owned 297 shares of the Company's preferred stock, which represents 68% of all shares of Company preferred stock, making Defendant Seaberg the controlling shareholder over matters voted on by preferred stock shareholders.[3]

44.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Seaberg made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|------------------------|---------------|
| May 25, 2023 | 608 | $99.71 | $60,624 |
| May 26, 2023 | 400 | $97.34 | $38,937 |
| May 30, 2023 | 3,692 | $94.92 | $350,437 |
| June 20, 2023 | 985 | $101.70 | $100,174 |
| July 3, 2023 | 4,264 | $106.59 | $454,499 |
| July 5, 2023 | 7,334 | $106.58 | $781,657 |
| August 2, 2023 | 880 | $113.57 | $99,941 |
| September 5, 2023 | 853 | $117.22 | $99,988 |

---

[3] According to the Form 10-K filed with the SEC on February 22, 2024, holders of the Company's preferred stock "*are entitled to elect five of our nine directors and only holders of our Preferred Stock are entitled to vote with respect to a merger, dissolution, lease, exchange or sale of substantially all of our assets, or on an amendment to the Articles of Incorporation*, unless such action would increase or decrease the authorized shares or par value of the Common or Preferred Stock, or change the powers, preferences or special rights of the Common or Preferred Stock so as to affect the holders of Common Stock adversely. Generally, our Common Stock and Preferred Stock vote as separate classes on all other matters requiring stockholder approval."

| October 2, 2023 | 1,414 | $103.46 | $146,296 |
| November 1, 2023 | 1,073 | $93.20 | $100,003 |
| December 4, 2023 | 1,110 | $90.09 | $99,999 |
| January 2, 2024 | 2,544 | $99.09 | $252,079 |
| January 3, 2024 | 9,345 | $96.30 | $899,923 |
| February 16, 2024 | 3,329 | $90.11 | $299,976 |
| August 23, 2024 | 12,092 | $90.64 | $1,095,970 |
| September 4, 2024 | 1,109 | $90.14 | $99,965 |

Thus, in total, before the fraud was exposed, Defendant Seaberg sold 60,236 shares of Company stock on inside information, for which she received approximately $5.9 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

45.    The 2024 Proxy Statement stated the following about Defendant Seaberg:

Ms. Seaberg is a member of the Heartland Chapter of National Association of Corporate Directors and the Kansas City Chapter of Women Corporate Directors ("WCD"). She was an executive travel agent and minority owner of Travel Center of Atchison for 31 years. Ms. Seaberg is active in civic affairs at both the local and national level. She was the Kansas Governor's Chair for the national Lewis and Clark Bicentennial Commemoration from 2002 to 2006, bringing one of 15 national events to Atchison, Leavenworth, and Kansas City in 2004. She also served on the Lewis & Clark Trail Heritage Foundation board, a national not-for-profit based in Great Falls, Montana, from 2003 to 2007 and as its national president from 2007 to 2008. Ms. Seaberg has been the chair of the annual Amelia Earhart Festival since 1997, which brings over 40,000 people to Atchison every year in July. Ms. Seaberg served on the Atchison Hospital Board from 1990 to 2004, and presently serves on the board of the Cray Medical Research Organization at the University of Kansas Medical Center. She also serves as a board member of the national Lewis and Clark Trust. Ms. Seaberg is president and founder of the Atchison Amelia Earhart Foundation, which opened a state-of-the-art STEM and history museum, the Amelia Earhart Hanger Museum, in April 2023 in Atchison. In 2015, she received the Hall of Fame award from the Chamber of Commerce and the Vision of

Excellence award from the Santa Fe Depot Trustees in Atchison. Ms. Seaberg's qualifications to serve on our Board include her business and civic experience and organizational skills as well as her knowledge of the Company and the industries in which it operates. Ms. Seaberg is the granddaughter of Cloud L. Cray, Sr., founder of the Company. Ms. Seaberg is Ms. Mingus's mother.

**Defendant Siwak**

46.    Defendant Siwak has served as a Company director since May 2022. He also serves as a member of the Compensation Committee and the Nominating and Governance Committee.

47.    The 2024 Proxy Statement stated the following about Defendant Siwak:

Mr. Siwak is the founding partner of Encore Group, a private equity fund focused on the consumer services sector. Prior to founding the Encore Group in November 2022, Mr. Siwak was the Chief Business Officer for North America for the Ferrero Group, a global sweet snacking company, from September 2021 to October 2022. Prior to joining Ferrero, Mr. Siwak was the Chief Executive Officer of Ferrara Candy Company from April 2013 until September 2021. From April 2009 to March 2013, Mr. Siwak was an operating partner for L Catterton Partners, a consumer-focused private equity group. From August 2005 to April 2007, Mr. Siwak was a founding partner of Mindseye Group, a private equity group. From December 1999 to August 2005, Mr. Siwak was the Chief Executive Officer of TRG Accessories, a manufacturer of luggage and travel gear. Mr. Siwak's qualifications to serve on our Board include his extensive leadership experience, his experience in the food industry, and his management, growth, and development of multi-brand portfolios.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

48.    By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of MGP and because of their ability to control the business and corporate affairs of MGP, the Individual Defendants owed MGP and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MGP in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of MGP and its shareholders so as to benefit all shareholders equally.

49.    Each controlling shareholder, director, and officer of the Company owes to MGP and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

50.    The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of MGP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

51.    To discharge their duties, controlling shareholders, officers, and directors of MGP were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

52.    Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of MGP, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholders, officers, and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised MGP's Board at all relevant times.

53.     As controlling shareholders, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

54.     To discharge their duties, the controlling shareholders, officers, and directors of MGP were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of MGP were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Kansas and the United States, and pursuant to MGP's own Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how MGP conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of MGP and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MGP's operations would comply with all applicable laws and MGP's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

55.    Each of the Individual Defendants further owed to MGP and the shareholders the duty of loyalty requiring that each favor MGP's interest and that of its shareholders over their own

while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

56.     At all times relevant hereto, the Individual Defendants were the agents of each other and of MGP and were at all times acting within the course and scope of such agency.

57.     Because of their advisory, executive, managerial, directorial, and controlling positions with MGP, each of the Individual Defendants had access to adverse, non-public information about the Company.

58.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MGP.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

59.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

60.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

61.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of MGP was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

62.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

63.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MGP and was at all times acting within the course and scope of such agency.

## MGP'S CODE OF CONDUCT

64.     The Code of Conduct states that the Code of Conduct "is applicable to all directors, officers, and employees of" the Company. The Code of Conduct continues, stating that the Company is "committed to conducting business with the highest ethical standards, integrity, and social responsibility."

65.    In a section titled "Financial Integrity and Accurate Business Records," the Code of Conduct states the following, in relevant part:

> MGPI is a public company that is committed to providing investors with full, fair, accurate, timely, and understandable disclosure in its financial statements and public communications. Employees responsible for these matters must: • comply with generally accepted accounting principles at all times; • maintain a system of internal controls that will provide reasonable assurances to management that all transactions are properly recorded; • maintain books and records that accurately and fairly reflect our transactions; • prohibit the establishment of any undisclosed or unrecorded funds, assets, or liabilities; • maintain a system of disclosure controls and procedures that will provide reasonable assurances to management that material information about us is made known to management, particularly during the periods in which our financial statements are being prepared; and • present information in our financial statements and public communications in a full, fair, accurate, timely, clear, and understandable manner.

66.    In a section titled "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> A "conflict of interest" exists when a person's private interest interferes in any way with the interests of the Company. You should avoid situations that may involve, or create the perception of, a conflict of interest.

67.    In a section titled "Compliance with the Law," the Code of Conduct states the following, in relevant part:

> If we do not comply with the law, we will create problems for ourselves as well as those around us. Illegal actions damage reputations and erode the confidence and trust that others have placed in us. Accordingly, it is our policy that all laws be obeyed, however insignificant, and that this requirement must be placed ahead of our own personal interests and the Company's operating results. The following are generalized comments on certain areas of the law and Company policies that you should always keep in mind.

> * * *

> Improper Use of Confidential Information. Treat all non-public information about the Company as confidential. Confidential information is an item of Company property to be used only for the proper conduct of the Company's business. You may not use it or allow others to use it to promote outside interests. You may share confidential information only with those who both have the authorization to access it and a need to know the information in order to do their jobs. Inappropriate,

intentional, or inadvertent disclosures may harm the Company's business or its stockholders. These improper disclosures can damage customer relationships, give our competitors an edge, or result in illegal stock trading profits generated at the expense of the uninformed. For more information, see the Employee Handbook.

Trading in MGPI's Stock and Other Securities. You must comply with insider trading and securities laws that prohibit buying or selling a company's securities while aware of material nonpublic information about a company or providing material nonpublic information to another person who trades on the basis of that information or passes that information to a third party who trades. For more information, see the Company's Insider Trading Policy.

68.     In a section titled "Reporting Violations," the Code of Conduct states the following,

in relevant part:

Any supervisor or manager who observes conduct that may violate this Code of Conduct or who learns of a violation or potential violation of this Code of Conduct must promptly report the matter to the General Counsel.

All violations of this Code of Conduct will be reported to the General Counsel, who will cause an appropriate investigation of the violation to be made as confidentially as possible. Any concerns reported to the General Counsel about financial accounting practices or the Company's system of internal accounting controls will also be reported to the Chair of the Audit Committee.

69.     In a section titled "Administration," the Code of Conduct states the following:

The Audit Committee is responsible for setting the standards set forth in this Code of Conduct and may update it from time to time. Any waiver of this Code of Conduct for members of the Board of Directors or executive officers may be made only by the Audit Committee and will be disclosed to the public as required by law or the rules of the Nasdaq Stock Market, when applicable. Waivers of this Code for other employees may be made only by our Chief Executive Officer or Chief Financial Officer and may be reported to the Audit Committee.

70.     In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' scheme to issue

materially false and misleading statements to the public and to facilitate and disguise the Individual

Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse

of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also,

in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Ethics.

## MGP'S AUDIT COMMITTEE CHARTER

71.     According to the Audit Committee Charter, the "purpose" of the Audit Committee is "to assist the Board in fulfilling its oversight responsibilities with respect to (i) accounting and financial reporting processes, (ii) financial statement audits, and (iii) monitoring significant risk exposures (footnotes omitted)."

72.     The Audit Committee Charter delineates the duties and responsibilities of the committee as follows, in relevant part:

**(a)**     Review of Performance and Charter. The Committee will annually review its own performance and policies and procedures, including this Charter.

**(b)**     Selection, Compensation, and Replacement of Independent Auditor. The Committee has sole authority to appoint, retain (with subsequent submission to the Company's stockholders for ratification), compensate, evaluate, oversee, and terminate the firm of independent registered public accountants serving as the Company's independent auditor (the "Independent Auditor").  The Committee will have oversight responsibility over the work of the Independent Auditor, and the Independent Auditor will report directly to the Committee.

                                        * * *

**(d)**     Independent Auditor Independence and Quality Control Procedures. The Committee will review and discuss the Independent Auditor's independence and quality control procedures with the Independent Auditor, which will include:

            (i)     At least annually, review of a written statement delineating all relationships between the Independent Auditor and the Company, including the matters set forth in applicable Public Company Accounting Oversight Board ("PCAOB") standards. The review will include an active dialogue with the Independent Auditor with respect to any disclosed relationships or services that may, in the view of the Committee, impact the objectivity and independence of the Independent Auditor. The Committee will take appropriate action in response to the Independent

25

Auditor's report to satisfy itself of the Independent Auditor's independence.

(ii)    At least annually, review of a report by the Independent Auditor describing the Independent Auditor's internal quality-control procedures, any material issues raised by the most recent internal quality-control review, peer review, or PCAOB review of the Independent Auditor, or by any inquiry or investigation by governmental or professional authorities within the preceding five years, respecting one or more independent audits carried out by the Independent Auditor, and any steps taken to deal with such issues.

(iii)    Confirming that Independent Auditor complies with rotation requirements of the lead audit partner, as required by SEC rules, and considering the rotation of the accounting firm serving as the Independent Auditor.

(iv)    Review and approving the Company's hiring policies related to employees or former employees of the Independent Auditor.

**(e)**    Oversight of the Audit. The Committee will review:

(i)    The plan for and scope of the annual audit of the Company's financial statements.

(ii)    The qualifications and performance of the Independent Auditor, including the lead audit partner.

(iii)    The results of the annual audit, including any critical audit matters.

(iv)    All critical accounting policies and practices to be used in the audit.

(v)    Assurances provided by the Independent Auditor with respect to the compliance of the audit with the requirements of Section 10A(a) of the Exchange Act relating to the detection of certain illegal acts, the identification of certain related party transactions, and an evaluation of the Company's ability to continue as a going concern.

(vi)    The manner in which the Company's internal accounting team works in connection with the Independent Auditor, including management's responses to recommendations made and plans for future audit coverage.

**(f)**    Oversight of Financial Reporting, Financial Statements, and Published Statements. The Committee will:

(i)    Review and discuss with management and the Independent Auditor the Company's financial statements and disclosures made in

26

"Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual and quarterly reports filed with the SEC on Form 10-K and Form 10-Q and the results of the Independent Auditor's review of the quarterly financial statements included in the Company's Quarterly Report on Form 10-Q.

(ii)   Provide a recommendation to the Board as to whether the audited financial statements should be included in the Company's Annual Report on Form 10-K for the applicable fiscal year based on the review and discussions with management and the Independent Auditor relating to the annual financial statements and the audit.

(iii)   Review and discuss with management earnings press releases, non-GAAP financial measures, earnings guidance, as well as financial information provided to analysts and rating agencies. Such discussions may be done generally (e.g. as to the types of presentations made or the types of information disclosed).

(iv)   Review and approve the audit committee report required by SEC rules in the Company's annual proxy statement.

(v)   Review and discuss with management and the Independent Auditor the effect of regulatory and accounting initiatives on the Company's financial statements.

(vi)   Discuss with the Independent Auditor any matters required to be discussed by applicable requirements of the PCAOB and the SEC, including the Independent Auditor's judgments about the quality, not just the acceptability, of the Company's accounting principles as applied in its financial reporting.

(vii)   Discuss with management and the Independent Auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements; any significant changes made by management in the basic accounting principles and reporting standards used in the preparation of the Company's financial statements; all alternative treatments of financial information within generally accepted accounting principles ("GAAP") related to material items that have been discussed with management, including the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Independent Auditor.

(viii) Discuss with the Independent Auditor any recommendations of the Independent Auditor with respect to internal controls and other financial matters, including any perceived weaknesses in the Company's internal controls, policies, and procedures, any special steps taken to address

material control deficiencies, and any recommendations regarding disclosures about changes in internal control over financial reporting.

(ix)  Discuss with the Independent Auditor management's report on internal control over financial reporting and the Independent Auditor's attestation of the report.

(x)  Discuss with management any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which could adversely affect the Company's ability to record, process, or summarize, and report financial data and any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal control over financial reporting.

(xi)  Review and discuss with management and the Independent Auditor material written communications between management and the Independent Auditor, such as (a) any engagement letter or independence letter, (b) any management letter, any schedule of unadjusted differences and a listing of adjustments and reclassifications not recorded, if any, and management's responses thereto, and (c) any reports on observations and recommendations on internal controls.

(xii) Review with management and the Independent Auditor any published reports or any correspondence from governmental agencies which raise material issues regarding the Company's accounting policies or financial statements.

\* \* \*

**(h)**  Internal Audit Matters. The Committee will:

(i)  Review the appointment, responsibilities, compensation, performance, plan, and replacement of persons performing the internal audit function.

(ii)  Receive reports directly from persons performing the internal audit function, including summaries of reports to management together with management's responses and follow up to these reports.

(iii) Periodically meet separately with persons performing the internal audit function, discussing any issues such persons believe warrant Committee attention.

The persons performing the internal audit function will have unfettered access to the Committee.

**(i)**  Risk Assessment. Periodically, the Committee will:

28

(i) Discuss the Company's major enterprise risk exposures, including cybersecurity risks, and any steps Company management has taken to monitor, manage, and mitigate such exposures.

(ii) Review legal and regulatory matters that may have a significant impact on the financial statements, related Company compliance policies and programs and material reports or inquiries received from regulatory agencies.

73.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

74.    MGP, headquartered in Atchison, Kansas, produces, distills, and distributes alcoholic beverages and food ingredients. The Company's business is split into three segments: Distillery Solutions, Branded Spirits, and Ingredient Solutions. Distillery Solutions consists of food grade alcohol to be used as an ingredient in food products, personal care products, cleaning solutions, and pharmaceuticals. Branded Spirits consists of premium plus, ultra-premium, super premium, premium, mid, and value branded distilled spirits for consumption.

75.    The Company's products are sold either directly or through distributors to manufacturers and processors of finished packaged goods. Many of the Company's customers are businesses, although the Company's branded products may be sold directly to individuals.

76.    The COVID-19 pandemic brought social isolation for many across the world, as well as the stress that comes with such isolation. As a result, many people began to consume alcohol in greater quantities than they had prior to the pandemic.

77.    As a result of this uptick in drinking, liquor companies, including MGP, benefitted considerably throughout the pandemic. In order to properly take advantage of this boom in alcohol demand, the Company increased its production.

78.    However, by the end of 2022, it was becoming increasingly clear that demand was beginning to slow and return to pre-pandemic levels. As such, at the beginning of the Relevant Period, and even before, the Company's inventory levels as well as industry-wide demand were at the top of investors' minds.

**False and Misleading Statements**

*May 4, 2023 Press Release*

79.    On May 4, 2023, the Company issued the Q1 2023 Earnings Release on Form 8-K with the SEC. The Q1 2023 Earnings Release revealed that the Company had surpassed its financial estimates for the first quarter of the 2023 Fiscal Year.

80.    The Q1 2023 Earnings Release also quoted Defendant Colo, who elaborated on the Company's growth in the first quarter, as well as how it intends to continue that growth. Defendant Colo was quoted as stating that "[s]ales of brown goods grew 10% from the prior year period to record levels, driven by strong new distillate customer commitments, higher pricing across all brown goods, and stronger than expected customer demand for spot purchases. Within our Branded Spirits segment, revenue grew 2% and we recently realigned our national distribution capabilities

with Republic National Distributing Company ("RNDC") toward the end of the quarter. We believe this realignment with RNDC, as well as continued investment in our premium plus family of spirits brands, continues to position us well for incremental growth and margin expansion opportunities going forward."

***May 4, 2023 Earnings Call***

81.    That same day, the Company hosted the Q1 2023 Earnings Call with investors to discuss the Company's first quarter financial results. During his scripted remarks on the Q1 2023 Earnings Call, Defendant Colo emphasized the Company's growth over the quarter, stating:

> Sales of our premium beverage alcohol increased 2%, with continued strength in brown goods sales this quarter, supported by ongoing solid demand for our new distillate and aged whiskey. We remain confident that our significant share, scale advantage and our aging whiskey inventory position, will continue to support the demand within the American whiskey category.
>
> We're pleased with the improvement in demand visibility and consistency, that we achieved in brown goods as brown good sales growth continues to outpace longer-term market trends, and is primarily driven by craft as well as multinational customers. In an effort to moderate the impact of increased input costs, and excess supply available in the market, for industrial alcohol and white goods, as discussed on our previous call, we reduced the volumes produced and sold of our industrial alcohol and white goods products during the first quarter, to minimize the negative impact on our profitability.

82.    In concluding the Company's scripted remarks, Defendant Colo expressed optimism surrounding the Company's demand for its products, stating:

> We are pleased with the solid results delivered this quarter, despite increased costs and broader macroeconomic uncertainty. ***Demand for our products in each of our three segments remains strong and we believe our business continues to be well positioned***. We expect to maintain a high level of operational execution and remain deliberate in our actions, as we navigate the market dynamics this year, which is why we are reconfirming our full year fiscal 2023 guidance.

83.     During the question-and-answer portion of the Q1 2023 Earnings Call, the

Individual Defendants fielded a number of questions pertaining to the Company's inventory levels.

Defendant Colo replied to one analyst's question as:

> *Vivien Azer – TD Cowen*: And then my follow-up question is on the commentary
> around inventories. Thank you very much for the incremental color on what it
> would have looked like or your top line would have looked like ex-Yellowstone.
> Can you comment at all on kind of more broadly like, what you're hearing from
> your wholesalers comfort around inventory levels, as we've gone through earnings
> season, it does seem -- and it's consistent with your script, there's a lot of caution
> around the US consumer. So I'm just kind of wondering, what wholesaler comfort
> level is with inventories today, what your comfort level is with your inventories
> today? Thank you.

> *Defendant Colo*: Yes. I think in general, I'd say that the distributors may be hearing
> a little more inventory at this point than normal. However, kind of the other thing
> that I think, we're anticipating at the distributor level is with interest rates
> continuing to rise and at the level they are now. It wouldn't surprise us if some of
> the distributors maybe carried less inventory going forward, because their carrying
> costs are going to be significantly higher than they were even a year ago. But that's
> kind of a different issue than the demand side of the equation really to inventory,
> Vivien. But those are a couple of our observations in the market right now.

> *Azer*: That's a really interesting consideration to call out. Is that factored into your
> full year guidance?

> *Defendant Colo*: It is at this point, yes.

84.     In a later question from a different analyst pertaining to the Company's inventory,

Defendant Colo replied:

> *Sean McGowan – ROTH Capital Partners*: Question on inventory, would you
> expect inventory levels to stay somewhat elevated in relation to sales as the year
> progresses, or will that be worked down to kind of be more in line with the sales
> growth at the end of the year?

> *Defendant Colo*: That's our expectation. Sean, we think that the year presses again
> particularly in line if you look at the carrying cost in the current interest rate
> environment we expect that inventory levels will pretty much -- **shipments should
> equal to completions is the ideal way the industry runs and we anticipate that as
> the year plays out that's where the inventories will kind of normalize too.**

*November 2, 2023 Press Release*

85.     On November 2, 2023, the Company issued a press release announcing its financial results for the third quarter of the 2023 Fiscal Year, which it also filed on Form 8-K with the SEC (the "Q3 2023 Earnings Release"). In the Q3 2023 Earnings Release, the Company highlighted its sales in brown goods. Specifically, the Q3 2023 Earnings Release quoted Defendant Colo as stating the sales were "driven by strong demand for our new distillate and aged whiskey."

***November 2, 2023 Earnings Call***

86.     That same day, the Company hosted an earnings call with investors and analysts to discuss the third quarter results (the "Q3 2023 Earnings Call"). During his scripted remarks on the Q3 2023 Earnings Call, Defendant Colo emphasized the growth in sales of brown goods. Defendant Colo even went so far as to suggest that sales for brown goods in 2024 were locked in, stating:

> Brown goods sales growth has continued to outpace longer term market trends and has been primarily driven by craft, as well as multinational customers. Our confidence in our brown goods sales visibility for the balance of the year remains high.

> Looking ahead to fiscal 2024, our visibility is also improving as we believe we now have the vast majority of our expected Distilling Solutions segment brown goods sales for 2024 already committed.

> We believe we are well positioned to support continued growth in the American whiskey category. We will continue to be strategic with our aged whiskey sales to enable us to meet expected customer needs for the balance of this year, as well as position us to meet anticipated customer needs in the coming years.

87.     In discussing inventory in his scripted remarks, Defendant Colo stated that the Individual Defendants "remain confident that inventory destocking for our brands is close to running its course, and we are focused on driving velocity and points of distribution across our portfolio of brands."

88.    In his concluding remarks, Defendant Colo continued to reiterate that "[d]emand for our products in each of the three segments remain strong and we believe our actions will continue to position the business for long-term success."

89.    In the question-and-answer portion of the Q3 2023 Earnings Call, an analyst from Truist Securities stated his concern about the Company's inventory levels, to which Defendant Colo replied:

> *Bill Chappell – Truist Securities*: A couple of questions. I guess, first on the Branded Spirits business, you talked that you were still working through some of kind of the excess inventory within channels and I think the whole industry is. I mean, any way to quantify like what sales could have been or how much that impacted branded sales, because still 6% year-over-year is pretty solid. So just trying to understand or did it really was a very small impact and no impact is expected going forward?

> *Defendant Colo*: Yeah. I think, Bill, we discussed this a little bit on the last quarter call, but we feel like we are pretty much through any issues with excess inventory at the distributor level. There may be a few brands that we still have a little bit to work through, but there was really, I don't think our revenue was materially impacted due to any excess inventory issues in the channel.

90.    A TD Cowen analyst then inquired about the volume of brown goods and white goods, to which Defendant Gall replied:

> *Viven Azer – TD Cowen*: Hi. Thank you. Good morning and I'd like to echo my congratulations to Dave. My first question is on the Distillery Products segment, another very nice quarter of price mix realization in premium beverage alcohol, of course, volumes are under pressure. I was wondering whether you could offer some commentary on kind of the volume dynamics between brown goods and white goods in the quarter, please? Thanks.

> *Defendant Gall*: Yeah. Vivien, this is Brandon. So, yeah, in our Q, we do break out premium beverage alcohol, which includes both brown goods and white goods, and within that, we share that sales are up 13%, but volume to your point is off 15% and that 15% downdraft is all directly related to white goods and industrial alcohol. So our demand for our brown goods from a volume standpoint remains intact, but I will share the majority of the 28% growth in brown goods in the quarter was price driven.

91.     Defendant Colo then added that "from our perspective, on our inventories, et cetera, what we try to do is balance particularly on our aged side. Our inventory needs and build of inventory with our anticipated future customer needs and demand. And we are still in that position today, we make our laydown decisions based on those anticipated needs and we are not seeing anything today that would tell us that we, as a company, are imbalanced in that particular regard."

92.     The above statements in ¶¶79-91 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) despite their claims, the Individual Defendants did not have a good sense as the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; and (4) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins Emerging While False and Misleading Statements Continue**

*February 22, 2024 Press Release*

93.     On February 22, 2024, the Company issued a press release announcing its fourth quarter and year-end results for the 2023 Fiscal Year, which it later filed on Form 8-K with the SEC (the "FY 2023 Earnings Release"). The FY 2023 Earnings Release quoted Defendant Bratcher, the Company's new CEO following Defendant Colo's retirement, as stating that "[d]emand for our new distillate and aged whiskey was strong, which resulted in brown goods sales increasing 39% and 26% for the fourth quarter and full year 2023, respectively, as compared to the prior year periods." Defendant Bratcher continued to state that "[w]e are very pleased with

our performance for the quarter and full year and remain confident in the long-term sustainability of our business model."

94.    Despite the positivity from Defendant Bratcher regarding the end of the 2023 Fiscal Year, as well as the Company surpassing analyst expectations for the 2023 Fiscal Year, the FY 2023 Earnings Release also revealed disappointing guidance for the upcoming 2024 Fiscal Year. The FY 2023 Earnings Release revealed full-year revenue guidance of $749 million at the midpoint, 4.9% below street consensus.

### *February 22, 2024 Earnings Call*

95.    That same day, the Company hosted an earnings call with analysts and investors to discuss the year-end results (the "FY 2023 Earnings Call"). On the FY 2023 Earnings Call, Defendant Bratcher explained the disappointing guidance while confirming industry reports, stating that "inventory destocking at a wholesale level will remain an issue for the branded spirits industry in 2024." Trying to downplay the negativity however, Defendant Bratcher went on to state that the Company "work[ed] closely with our distributors throughout 2023" and ""made significant progress in managing wholesaler inventory for our portfolio." In terms of demand, Defendant Bratcher stated ""[h]ealthy demand for our products continue and we believe our business remains well-positioned."

96.    Continuing to discuss inventory levels, Defendant Bratcher went on to state that "more than 90% of our new distillate whiskey sales volume is committed in 2024, compared to 50% of our aged whiskey sales volume committed," which he believed was a positive sign for the sales of American whiskey. Defendant Bratcher did caveat these sentiments however, stating that "[w]e expect total aged whiskey revenues in 2024 to be less than 2023, due to our strategy of developing longer-term stability with new distillate and because of our success in working with

longer-term craft customers, who started their brands with aged whiskey and are now moving into the new distillate market."

97.     During the question-and-answer portion of the call, the Individual Defendants did their best to downplay any potential concerns investors may have pertaining to the newly revealed guidance. In one exchange with a Truist Securities analyst, Defendant Gall elaborated:

> *Bill Chappell – Truist Securities*: Just wanted to go back on the kind of the new distillate sales, and I think one of the things you said was total sales would be down in '24 versus '23. So if you maybe could give some more color, I think you kind of explained what was some customer changes and stuff like that, but try to understand that?
>
> And then also, you had mentioned that you're monitoring the overall American whiskey supply levels, and that might be a headwind. So kind of maybe help us understand that? Are you talking about at retail or are you talking about supply of other players coming for new distillate?
>
> *Defendant Gall*: Yeah, Bill. I'll start on that. Yeah, thanks for giving us the opportunity to clarify. ***So we do not expect new distillate sales to decline year-over-year. In fact, we expect brown goods sales in total to continue to grow in line with or better than the broader category of American whiskey in 2024. What we're trying to get across in our prepared remarks is that the proportion of new distillate sales versus aged sales has been growing***. And that has been deliberate as David mentioned on the call. And the reason for that is as our customers that traditionally bought aged, as they continue to mature and grow, they're now better able to finance new distillate.
>
> And so we're leaning into that because there's a lot of attributes of new distillate customers that we find attractive, such as the greater visibility they provide and the greater cash flow characteristics of sliding (ph) distillate versus aged brings. As far as moderating the overall supply to the industry, that's not our plan. We're continuing to grow with our portfolio and with our customers. And as such, the mix may change more towards new versus aged, but we continue to grow at the same pace or better than the American whiskey category as we've done in recent years.

98.     Defendant Bratcher also added in some points to clarify the situation, stating:

> Yeah. I'll add to that too, just in clarification. The new distillate focus is really critical for our business. It gives us longer-term arrangements, financial stability, and visibility for multi-years on average. It's a better business for us in terms of understanding the impact financially on the overall business. It also is somewhat a normal cycle, as the category continues to grow and some of our previous craft

customers become bigger, they're naturally going to switch over to new distillate supply, that's just normal. There is no -- we have no plans to moderate our supply to it.

As a matter of fact, we've taken just the opposite approach, as you heard in our call (ph) script, that we're expanding one of our major distilleries in Kentucky, basically doubling its capacity and we expect it to come online mid-year. So we're very optimistic about Branded sales and a plan to expand and continue to grow with the segment.

99.    The same analyst then asked a follow-up question regarding potential slow-downs,

to which Defendant Bratcher replied:

*Chappell*: Got it. Now that helps. And then if I'm looking at the, just the aged demand, I understand that you're naturally kind of leaning into the new, but are you hearing from your customers, now you have 800 customers, any worries that there's going to be a slowdown in brown good demand three, four years out from now, or is kind of the overall interest pretty much the same as it has been the past few years?

*Defendant Bratcher*: I think what we could say on that is that if we look at our aged distillate and when you referenced about 50% of it being obligated, that's actually pretty high number on aged because most of these tend to be craft customers or new entrants into the category. So actually we feel pretty good about the amount that we have contracted and how that relates to any potential unknown is, is that, those the craft -- the craft distilleries or craft brand companies are subject to the same inventory, retail, wholesale level type of inventory situations as anybody.

And so with higher interest rates and everything else, they're being a little more cautious with their investment. In the past, we've saw them buy just so they could corner their piece of the business. Now you're starting to see them switch to more just-in-time type of demand. They want to transact, know they can fill the product and get it right through the shelf, given the high interest rates that they operate in.

100.    The same analyst asked one final question regarding the potential of the Company

experiencing a flat quarter due to destocking, to which Defendant Bratcher replied:

*Chappell*: Got it. And last question, just on the aged, sorry, on the Branded portfolio, your comments about there's still some destocking at distributors and stuff like that, does that mean, I thought most of the impact you kind of saw in the first half of last year, do you expect a quarter where we could be flat to down for that overall business, excluding Penelope or is most of the heavy destocking done?

*Defendant Bratcher*: The comment in general was about the industry overall. ***There is still a push on inventory destocking for the industry overall. As it relates***

*specifically to our business, we've worked really hard in the past year to manage that -- actively manage that with our wholesalers. We believe we have it in a controllable area of data on hand*. At the end of the day, the wholesalers do control the inventory and they place the order and they decide what the number is. *I think our exposure on it for us is smaller than, let's say, our peer set because I think we've done a really good job of managing it in 2023*.

101.    On this news, the price per share of MGP stock fell $13.65, or 14.9%, from closing at a price of $91.83 per share on February 21, 2024, to close at a price of $78.14 per share on February 22, 2024. However, the Individual Defendants continued to obfuscate the truth in its public statements pertaining to demand for the Company's product and its inventory levels, including in the above statements.

**2024 Proxy Statement**

102.    On April 9, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

103.    The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak to the Board; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal year; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the 2024 Incentive Plan.

104.    The 2024 Proxy Statement noted that if the MGP shareholders approved the 2024 Incentive Plan, it would become effective immediately, as the pre-existing 2014 plans had otherwise expired on April 1, 2024. Further, the 2024 Proxy Statement noted that approval of the 2024 Incentive Plan will cause 1,320,000 shares to be made available under the 2024 Incentive

Plan for issuance. Additionally, the 2024 Incentive Plan makes clear that employees and non-employee directors alike are eligible to receive compensation under the plan, and that there is no separate non-employee director incentive plan.

105.    Regarding the "Board Role in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> Our Board as a whole has ultimate responsibility for risk oversight. It exercises this oversight function through its standing committees, each of which has primary risk oversight accountability for matters relating to their respective area of responsibility, as detailed below. The independent structure of our Board and Board committees allows for objective risk oversight.
>
> - Audit Committee: Oversees the integrity of our financial statement and financial reporting process, risks related to our financial reporting practices and internal controls, and our enterprise risk management ("ERM") process, which includes cybersecurity risks.
>
>   As part of our ERM process, management regularly identifies, evaluates, and prioritizes potential risks and creates a risk register of these risks. Our executive management team and business unit leaders decide on actions and strategies to use to mitigate our risks based on this risk register. Our ERM process and risk register were reviewed with the Audit Committee, along with our strategies for managing our risks, at three meetings during 2023.
>
> - Human Resources and Compensation Committee: Oversees risks related to our compensation policies and practices as well as human capital management.
>
> - Nominating and Corporate Governance Committee: Oversees risks related to our corporate governance, governance structure, Board composition, Board independence, as well as environmental, social, and governance ("ESG") matters, except those matters overseen by another Board committee (such as human capital management).

106.    Regarding the Code of Conduct, the 2024 Proxy Statement stated the following:

> Our Board has adopted Corporate Governance Guidelines, which are available on the Governance page of the Investor Relations section of our website at ir.mgpingredients.com/corporate-governance/governance-documents, along with our Board committee charters and Code of Conduct.

107.    Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) despite their claims, the Individual Defendants did not have a good sense as the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

108.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

109.    As a result of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as

the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve named executive officer compensation on an advisory, non-binding basis; and (4) approve the 2024 Incentive Plan.

110.    As a result of the shareholders approving the 2024 Incentive Plan, the plan took effect immediately upon reaching shareholder approval. Additionally, there were 1,320,000 shares available for issuance under the 2024 Incentive Plan. The Individual Defendants, including many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Incentive Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2024 Incentive Plan in the future.

### May 2, 2024 Earnings Call

111.    On May 2, 2024, the Company announced its financial results for the first quarter of the 2024 Fiscal Year. That same day, the Company hosted an earnings call with investors and analysts to discuss the results (the "Q1 2024 Earnings Call"). On the Q1 2024 Earnings Call, Defendant Gall reiterated a point made by Defendant Bratcher in the FY 2023 Earnings Call, namely that the Company ""continue[s] to monitor the potential impact of inventory levels at distributors overall, American whiskey supply and consumption patterns and inflation," while the Company was also ""uniquely positioned to grow as a company in this dynamic operating environment."

112.    For his part during the Q1 2024 Earnings Call, Defendant Bratcher noted how the Company's inventory had "stabilized" as the Company "worked really hard with our distributors

and understanding the inventory levels and managing [how] to meet customer demand." Additionally, Defendant Bratcher mentioned that "destocking for us at a distributor level is not a core issue," as the Company was able to "get that inventory manage[d] to the right level[.]"

***August 1, 2024 Earnings Call***

113.    On August 1, 2024, the Company announced its financial results for the second quarter of the 2024 Fiscal Year. That same day, the Company hosted an earnings call with investors to discuss the results (the "Q2 2024 Earnings Call").

114.    On the Q2 2024 Earnings Call, Defendant Bratcher discussed how he was "proud of our sales team for their nimbleness as they continue to work with our branded customers to help them successfully adapt to the current consumption and inventory patterns at distributor and retailer levels." Additionally, Defendant Bratcher touched on any inventory concerns, by stating that "***[d]istributor inventories for our branded portfolio remain relatively stable, even below historical levels***." Defendant Gall repeated this sentiment later on the call, stating "[d]istributor inventory levels for our brands are in good shape." Defendant Bratcher further added that "inventory is exactly where we need," as the Company "continue[d] to monitor [inventories] on a daily basis."

115.    The above statements in ¶¶93, 95-100 and 111-114 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) despite their claims, the Individual Defendants did not have a good sense of the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Incentive Plan; and (5) the

Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Fully Emerges

***October 17, 2024 Press Release***

116.    The truth began to emerge on October 17, 2024, when the Company issued a press release that it filed with the SEC on Form 8-K announcing its preliminary financial results for the third quarter of the 2024 Fiscal Year (the "Q3 2024 Preliminary Earnings Release"). The Q3 2024 Preliminary Earnings Release revealed an anticipated 14% decrease in the Company's sales year-over-year. As such, the Q3 2024 Preliminary Earnings Release further revealed the Company was forced to negatively update its guidance.

117.    The Q3 2024 Preliminary Earnings Release included a quote from Defendant Bratcher, who finally admitted to investors what they had been fearing, and the Company had been deflecting, for a long time: that the Company's high inventory levels were a significant issue. In full, Defendant Bratcher stated that "[s]oft alcohol spirits category trends and elevated industry-wide whiskey inventories are putting greater than expected pressure on our brown goods business with a larger impact on our smaller, craft customer base. We expect these industry headwinds to persist at least through the rest of the year and will share details about our 2025 outlook with our fourth quarter 2024 earnings release."

118.    On this news, the price per share of MGP stock fell $24.07 over the course of three trading days, or 29.5%, from closing at a price of $81.57 per share on October 17, 2024, to close at a price of $57.50 per share on October 22, 2024.

***October 31, 2024 Press Release***

119.    The truth fully emerged on October 31, 2024, when the Company the Q3 2024 Earnings Release. The Q3 2024 Earnings Release revealed that, as the result of ""the softening American whiskey category trends and elevated industry-wide barrel inventories," the Company needed to "further lower our net aging whiskey put away, scale down our whiskey production, and optimize our cost structure to mitigate lower production volumes."

**October 31, 2024 Earnings Call**

120.    That same day, the Company hosted the Q3 2024 Earnings Call with investors. On the Q3 2024 Earnings Call, Defendant Bratcher admitted that "slower growth and **higher inventories** are leading to lower demand, lower prices and reduced visibility on our contract distilling sales." Defendant Gall then added that as a result, the Company would "significantly reducing our brown goods production to **better align with demand in 2025**. At the same time, softer American whiskey growth and elevated barrel inventories continue to constrain demand for aged whiskey and increasingly our new distillate."

121.    Analysts pulled no punches during the question-and-answer portion of the Q3 2024 Earnings Call, with one Truist Securities analyst going so far as to tell the Individual Defendants that "we've seen a slowdown in American whiskey consumption now for 12, almost 18 months. And so I guess **the surprise factor is that you're just realizing it, seeing it now**."

122.    In response to a question from a Sturdivant analyst as to how the Individual Defendants "missed" signs of the liquor slowdown, Defendant Bratcher explained:

*Mitch Pinheiro – Sturdivant*: Okay. Then getting back to the -- it does surprise me that industry-wide everybody sort of missed the slowdown. I'm curious whether any of that has to do with any on-premise, off-premise trends that may have been missed?

And then the second question is, what also may have been missed, which I've been seeing for a while is, consumer liquor cabinet destocking. Once you can -- once you're able to get your favorite brand back during the COVID error, it was hard to

find it. And if you found a bottle or 2, you bought 2 or 3 or 4 bottles because you weren't sure you were ever going to see them again.

And I guess at some point, consumers decided -- they felt more comfortable with starting to see their favorite brands on the shelves and starting to -- instead of buying it, just going through their own cabinet and reducing their own inventory, I guess there's no way -- Have you done any research on that part of the equation as far as the slowdown in consumption is concerned? And just also the comments on the premise versus -- on-premise versus off-premise missing the slowdown here?

*Defendant Bratcher*: Okay. And I'll take that one. So in general, if you think about on-premise versus off-premise, the mix is roughly the same, but the problem post-COVID, there's not as many as on-premises there was. So you're still seeing that being relaunched over time. I'm not going to attribute that mix to the industry's view on why it happened. I tend to take more of a macro view on this. I tend to think that we're in the middle of an election. We've had all kinds of interesting things going on in the environment. Consumer spending is a little bit slower than this.

I think there's a lot of external pressures going on here that is making that consumer make different choices, all right? And so I don't want to speculate on they're selling more there or not selling more there. I'm attributing it to that consumer. I also bring it back to this COVID piece. Having done this for 30 years in the brands, what we're selling back to is about what we should be in the industry. COVID was great for our industry for the period of time.

And now when we all reflect back and we look at these last few years of correction, and it is inventory destocking at a wholesaler, it is inventory destocking in a pantry. You've got multitudes of variables coming to a head. Those 2 shall pass. Now what we all are terrible at doing, myself and everybody else in the industry is telling you exactly when that's going to pass. You know why? Because we can't read the consumers' minds. We can only watch what they're doing and react to their needs.

123.    On this news, the price per share of MGP stock fell $8.27, or 14.7%, from closing at a price of $56.31 per share on October 30, 2024, to close at a price of $49.04 per share on October 31, 2024.

## SUBSEQUENT DEVELOPMENT

124.    On December 20, 2024, the Company announced on Form 8-K that Defendant Bratcher was departing from his role as CEO and as a director on at the close of business on

December 31, 2024 "under circumstances entitling him to severance benefits under his employment agreement."

125.    The Form 8-K also announced that Defendant Gall would take over as interim-CEO effective January 1, 2025 as the Company searched for a replacement for Defendant Bratcher.

## REPURCHASES DURING THE RELEVANT PERIOD

126.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $10 million to repurchase approximately 128,360 shares of its own common stock at artificially inflated prices from March 2024 through July 2024.

127.    According to the Form 10-Q the Company filed with the SEC on May 2, 2024 for the quarterly period ended March 31, 2024 (the "Q1 2024 10-Q"), between March 1, 2024 and March 31, 2024, the Company repurchased 59,084 shares of its own common stock at an average price per share of approximately $84.62, for a total cost to the Company of approximately $4,999,688.

128.    As the Company's stock was actually worth only $49.04, the price at closing on October 31, 2024, the Company overpaid by approximately $2,102,209 for repurchases of its own tock between March 1, 2024 and March 31, 2024.

129.    According to the Form 10-Q the Company filed with the SEC on August 1, 2024 for the quarterly period ended June 30, 2024 (the "Q2 2024 10-Q"), between May 1, 2024 and May 31, 2024, the Company repurchased 33,363 shares of its own common stock at an average price per share of approximately $74.93, for a total cost to the Company of approximately $2,499,890.

130.    As the Company's stock was actually worth only $49.04, the price at closing on October 31, 2024, the Company overpaid by approximately $863,768 for repurchases of its own tock between May 1, 2024 and May 31, 2024.

131.    According to the Form 10-Q the Company filed with the SEC on October 31, 2024 for the quarterly period ended September 30, 2024 (the "Q3 2024 10-Q"), between July 1, 2024 and July 31, 2024, the Company repurchased 35,913 shares of its own common stock at an average price per share of approximately $69.61, for a total cost to the Company of approximately $2,499,904.

132.    As the Company's stock was actually worth only $49.04, the price at closing on October 31, 2024, the Company overpaid by approximately $738,730 for repurchases of its own tock between July 1, 2024 and July 31, 2024.

133.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $3.7 million.

## **DAMAGES TO MGP**

134.    As a direct and proximate result of the Individual Defendants' conduct, MGP will lose and expend many millions of dollars.

135.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

136.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

137.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

138.    Such losses include the Company's overpayment of approximately $3.7 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

139.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

140.    As a direct and proximate result of the Individual Defendants' conduct, MGP has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

141.    Plaintiff brings this action derivatively and for the benefit of MGP to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of MGP, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, for violations of Section 14(a) of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act.

142.    MGP is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

143.    Plaintiff is, and has been at all relevant times, a shareholder of MGP. Plaintiff will adequately and fairly represent the interests of MGP in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

144.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

145.    A pre-suit demand on the Board of MGP is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following eight individuals: Defendants Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to four of the eight Directors that were on the Board at the time of the filing of this complaint.

146.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

147.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted MGP to issue materially false and misleading statements. Specifically, the Director-Defendants caused MGP to issue false and misleading statements which were intended to make MGP appear more profitable and attractive to investors.

Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

148.    Moreover, the Director-Defendants solicited the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to MGP.

149.    In addition, the Director-Defendants caused the 2024 Proxy Statement to call for a shareholder vote to approve the 2024 Incentive Plan, which took the place of the previously existing plans as they expired on April 1, 2024. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2024 Incentive Plan who would not have approved the 2024 Incentive Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Incentive Plan at the annual meeting of stockholders of MGP on May 23, 2024, the previously existing plans had expired on April 1, 2024. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for from the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Incentive Plan that made 1,320,000 shares available under the 2024 Incentive Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

150.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-

Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

151.    To date, Defendants Lux, Mingus, and Seaberg have received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein. As a result of the false and misleading statements, Defendant Lux profited by approximately $6.5 million during the Relevant Period, Defendant Mingus profited by approximately $1.7 million during the Relevant Period, and Defendant Seaberg profited by approximately $5.9 million during the Relevant Period.

152.    Additional reasons that demand on Defendant Clark is futile follow. Defendant Clark has served as a Company director since June 2021. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee and the Nominating and Governance Committee. Defendant Clark has received and continues to receive compensation for her role as a director. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, Siwak, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Clark is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant

Clark breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

153.    Additional reasons that demand on Defendant Gerke is futile follow. Defendant Gerke has served as a Company director since June 2021. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Governance Committee. Defendant Gerke has received and continues to receive compensation for his role as a director. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Lux, Michelson, Mingus, Rauckman, Seaberg, Siwak, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Gerke is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Gerke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

154.    Additional reasons that demand on Defendant Lux is futile follow. Defendant Lux has served as a Company director since June 2021, and as the Board Chairman since January 20224. Defendant Lux has received and continues to receive compensation for his role as a director. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke,

Michelson, Mingus, Rauckman, Seaberg, Siwak, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Lux is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Lux breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

155.    Additional reasons that demand on Defendant Michelson is futile follow. Defendant Michelson has served as a Company director since May 2022. She also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee. Defendant Michelson has received and continues to receive compensation for her role as a director. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Mingus, Rauckman, Seaberg, Siwak, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Michelson is eligible to receive stock awards under the 2024 Incentive Plan, thereby

materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Michelson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

156.    Additional reasons that demand on Defendant Mingus is futile follow. Defendant Mingus has served as a Company director since June 2020. She also serves as a member of the Compensation Committee and the Nominating and Governance Committee. Defendant Mingus has received and continues to receive compensation for her role as a director. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Rauckman, Seaberg, Siwak, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. In addition, Defendant Mingus cannot disinterestedly consider a demand to sue the directors, which include her mother, Defendant Seaberg. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Mingus is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Mingus breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

157.    Additional reasons that demand on Defendant Rauckman is futile follow. Defendant Rauckman has served as a Company director since June 2021. He also serves as the

Chair of the Nominating and Governance Committee and as a member of the Audit Committee and Compensation Committee. Defendant Rauckman has received and continues to receive compensation for his role as a director. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Seaberg, Siwak, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Rauckman is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Rauckman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

158.    Additional reasons that demand on Defendant Seaberg is futile follow. Defendant Seaberg has served as a Company director since August 2009. She also previously served as the Board Chairperson from December 2014-December 2024. In addition, Defendant Seaberg serves as a member of the Compensation Committee and the Nominating and Governance Committee. Defendant Seaberg has received and continues to receive compensation for her role as a director. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Siwak, and herself to the Board, which allowed them to continue

to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. In addition, Defendant Seaberg cannot disinterestedly consider a demand to sue the directors, which include her daughter, Defendant Mingus. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Seaberg is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Seaberg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

159.    Additional reasons that demand on Defendant Siwak is futile follow. Defendant Siwak has served as a Company director since May 2022. He also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee. Defendant Siwak has received and continues to receive compensation for his role as a director. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, under the 2024 Incentive Plan,

Defendant Siwak is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Siwak breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

160.    Additional reasons that demand on the Board is futile follow.

161.    Demand in this case is further excused because the Class A directors, comprised of Defendants Gerke, Rauckman, and Siwak, are beholden to and controlled by Defendant Lux, who is the common stock controlling shareholder. Defendant Lux controls the Class A directors' continued nomination to the Board. In light of this control, Defendants Gerke, Rauckman, and Siwak cannot impartially consider a demand against Defendant Lux, as they are dependent on him for their continued positions with the Company and the compensation that goes with that. Thus, Defendants Gerke, Rauckman, and Siwak are unable to evaluate a demand with disinterest or independence given Defendant Lux's control over them.

162.    Demand in this case is further excused because the Class B directors, comprised of Defendants Clark, Michelson, and Mingus, are beholden to and controlled by Defendant Seaberg, who is the preferred stock controlling shareholder. Defendant Seaberg controls the Class B directors' continued nomination to the Board. In light of this control, Defendants Clark, Michelson, and Mingus cannot impartially consider a demand against Defendant Seaberg, as they are dependent on her for their continued positions with the Company and the compensation that goes with that. Thus, Defendants Clark, Michelson, and Mingus are unable to evaluate a demand with disinterest or independence given Defendant Seaberg's control over them.

163.    Defendants Clark (as Chair), Gerke, Michelson, Rauckman, and Siwak served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee

Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Business Standards. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

164.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations, and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

165.    MGP has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against

the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for MGP any part of the damages MGP suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

166.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

167.    The acts complained of herein constitute violations of fiduciary duties owed by MGP's controlling shareholders, officers, and directors, and these acts are incapable of ratification.

168.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of MGP. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of MGP, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action

is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

169.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause MGP to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

170.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

171.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

172.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

173.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

174.     Under the direction and watch of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

175.     The 2024 Proxy Statement also failed to disclose that: (1) despite their claims, the Individual Defendants did not have a good sense as to the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

176.     In exercise of reasonable care, Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff

in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including but not limited to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak to the Board and the approval of the 2024 Incentive Plan.

177.    The false and misleading elements of the 2024 Proxy Statement led to, among other things, the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak to the Board, which allowed them to continue to breach their fiduciary duties to the Company, and the approval of the 2024 Incentive Plan.

178.    The Company was damaged as a result of Defendants Bratcher's, Clark's, Gerke's, Lux's, Michelson's, Mingus's, Rauckman's, Seaberg's, and Siwak's material misrepresentations and omissions in the 2024 Proxy Statement.

179.    Plaintiff, on behalf of MGP, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

180.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding MGP. Not only is MGP now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon MGP by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the

Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 128,360 of its own shares at artificially inflated prices, damaging MGP.

182.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

183.    The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about MGP not misleading.

184.    The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and

for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

185.    By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

186.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

187.    The Individual Defendants, by virtue of their positions with MGP and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of MGP and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause MGP to engage in the illegal conduct and practices complained of herein.

188.    Plaintiff, on behalf of MGP, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

189.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

190.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of MGP's business and affairs.

191.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

192.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of MGP.

193.    In breach of their fiduciary duties owed to MGP, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: 1) despite their claims, the Individual Defendants did not have a good sense as to the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

194.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

195.    Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

196.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while

three of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $14.2 million.

197.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of MGP's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

198.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

199.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MGP has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

200.    Plaintiff, on behalf of MGP, has no adequate remedy at law.

**FIFTH CLAIM**
**Against Individual Defendants for Unjust Enrichment**

201.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

202.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MGP.

203. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from MGP that was tied to the performance or artificially inflated valuation of MGP or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

204. Plaintiff, as a shareholder and a representative of MGP, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

205. Plaintiff, on behalf of MGP, has no adequate remedy at law.

**SIXTH CLAIM**
**Against Individual Defendants for Abuse of Control**

206. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MGP, for which they are legally responsible.

208. As a direct and proximate result of the Individual Defendants' abuse of control, MGP has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, MGP has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

209. Plaintiff, on behalf of MGP, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Individual Defendants for Gross Mismanagement

210.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MGP in a manner consistent with the operations of a publicly held corporation.

212.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, MGP has sustained and will continue to sustain significant damages.

213.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

214.    Plaintiff, on behalf of MGP, has no adequate remedy at law.

## EIGHTH CLAIM
### Against Individual Defendants for Waste of Corporate Assets

215.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

216.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

217.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused MGP to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend

unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

218.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

219.    Plaintiff, on behalf of MGP, has no adequate remedy at law.

### NINTH CLAIM

**Against Defendants Colo, Bratcher, and Gall for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

220.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

221.    MGP and Defendants Colo, Bratcher, and Gall are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Colo's, Bratcher's, and Gall's willful and/or reckless violations of their obligations as officers and/or directors of MGP.

222.    Defendants Colo, Bratcher, and Gall, because of their positions of control and authority as officers and/or directors of MGP, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of MGP, including the wrongful acts complained of herein and in the Securities Class Action.

223.    Accordingly, Defendants Colo, Bratcher, and Gall are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange

Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

224.    As such, MGP is entitled to receive all appropriate contribution or indemnification from Defendants Colo, Bratcher, and Gall.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of MGP, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to MGP;

(c)    Determining and awarding to MGP the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing MGP and the Individual Defendants to take all necessary actions to reform and improve MGP's corporate governance and internal procedures to comply with applicable laws and to protect MGP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of MGP to nominate at least four

candidates for election to the Board; and

     3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

    (e)    Awarding MGP restitution from the Individual Defendants, and each of them;

    (f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

    (g)    Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: January 23, 2025           Respectfully Submitted,

**WALTERS, RENWICK, RICHARDS
& VAUGHAN, P.C.**

*/s/ Karen Wedel Renwick*
Karen Wedel Renwick, D. Kan #12095
R. Frederick Walters, Ks. Dist. #70561
1100 Main Street, Suite 2500
Kansas City, MO 64105
Telephone: (816) 421 -6620
Facsimile: (816) 421-4747
E-mail: krenwick@wrrvlaw.com
Email: fwalters@wrrvlaw.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

## **VERIFICATION**

      I, Cole Sebald, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

      I declare under penalty of perjury that the foregoing is true and correct.  Executed this 7th__ day of January, 2025.

Signed by:

04DF1B3012CC45C...

Cole Sebald