**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| COLE SEBALD, derivatively on behalf of MGP INGREDIENTS, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>DAVID COLO, DAVID S. BRATCHER, BRANDON M. GALL, NEHA J. CLARK, THOMAS A. GERKE, DONN LUX, PREET H. MICHELSON, LORI L.S. MINGUS, KEVIN S. RAUCKMAN, KAREN L. SEABERG, and TODD B. SIWAK,<br><br>Defendants,<br><br>and<br><br>MGP INGREDIENTS, INC.,<br><br>Nominal Defendant. | Case No.: 2:25-cv-02034-JWB-BGS (Lead Case) |
| BRYAN REID, Derivatively on Behalf of Nominal Defendant MGP INGREDIENTS, Inc.,<br><br>Plaintiff,<br><br>v.<br><br>DAVID BRATCHER, NEHA CLARK, DAVID COLO, BRANDON GALL, THOMAS GERKE, DONN LUX, PREET MICHELSON, LORI MINGUS, KEVIN RAUCKMAN, KAREN SEABERG, and TODD SIWAK,<br><br>Defendants,<br><br>and<br><br>MGP INGREDIENTS, Inc.,<br><br>Nominal Defendant. | Case No.: 2:25-cv-02127-JWB-BGS |

**<u>VERIFIED CONSOLIDATED AMENDED SHAREHOLDER DERIVATIVE COMPLAINT</u>**

Plaintiffs Cole Sebald and Bryan Reid ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant MGP Ingredients, Inc. ("MGP" or the "Company"), file this Verified Consolidated Amended Shareholder Derivative Complaint against David Colo ("Colo"), David S. Bratcher ("Bratcher"), Brandon M. Gall ("Gall"), Neha J. Clark ("Clark"), Thomas A. Gerke ("Gerke"), Donn Lux ("Lux"), Preet H. Michelson ("Michelson"), Lori L.S. Mingus ("Mingus"), Kevin S. Rauckman ("Rauckman"), Karen L. Seaberg ("Seaberg"), and Todd B. Siwak ("Siwak") (collectively, the "Individual Defendants," and together with MGP, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of MGP, the aiding and abetting thereof, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Sections 10(b), 20(a), and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution against Defendants Colo, Bratcher, and Gall under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MGP, legal filings, news reports, securities analysts' reports and advisories about the Company, filings in the securities class action captioned *In re MGPI Ingredients, Inc. Securities Litigation*, Case No. 2:25-cv-02153-JWB-BGS (D. Kan.) (the "Securities Class Action"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by MGP's current and former directors and officers from May 4, 2023 through October 31, 2024, both dates inclusive (the "Relevant Period").

2. Headquartered in Atchison, Kansas, MGP's chief business activities are the production, distillation, and distribution of alcoholic beverages. Among the kinds of alcohol produced by MGP are gin, tequila, vodka, bourbon, rye, and other whiskeys. In the alcohol industry, liquors such as bourbon, rye, and other whiskeys are classified as "brown goods," while grain-neutral spirits are classified as "white goods."

3. The COVID-19 pandemic and subsequent stay at home mandates significantly reduced the number of activities individuals could partake in, particularly outside the home. One manner in which consumers worldwide adjusted to this new reality was by increasing their consumption of alcohol. Within the United States alone, there was a significant increase in retail sales of alcohol in 2020.

4. As a result of this uptick in drinking, companies who sold alcoholic beverages, including MGP, benefitted considerably throughout the pandemic. In order to meet this bump in demand, the Company began to increase its production. Consequently, MGP reported increased sales and revenue for both 2021 and 2022.

5. However, the COVID-19 pandemic and its associated restrictions began to wane in 2022, and by the latter half of the year such restrictions were fully rescinded. This inevitable shift predictably resulted in reduced demand for retail liquor, as well as increased alcohol inventories due to consumer destocking. Despite this, the Individual Defendants persisted in convincing investors that such declines in demand were not applicable to the Company, and thus, that MGP was shielded from COVID-19 restriction-related demand shocks.

6. Throughout the Relevant Period, the Individual Defendants caused MGP to make false and misleading statements about the Company's supposed insulation from the demand and inventory issues affecting the alcohol industry as a whole.

7. For example, on May 4, 2023, the Company hosted an earnings call with investors to discuss the financial results for the first quarter of the fiscal year ended December 31, 2023 (the "2023 Fiscal Year") (the "Q1 2023 Earnings Call"). On the Q1 2023 Earnings Call, it was conveyed to investors that the Company was protected from industry-wide demand and inventory issues. Specifically, it was represented that the Individual Defendants anticipated excess inventory to "normalize" by the end of the year, with "shipments [] equal to [completions]," which was "the ideal way the industry runs." The Individual Defendants stressed that the Company was set apart from its industry competitors, citing MGP's "significant share, scale advantage and our aging whiskey inventory position" as support.

8. Throughout the Relevant Period, the Individual Defendants continued to represent to investors that demand for the Company's product remained robust. For instance, on August 3, 2023, the Company issued a press release to announce its financial results for the second quarter of the 2023 Fiscal Year (the "Q2 2023 Earnings Release"). The Q2 2023 Earnings Release highlighted consumers' "strong demand for our new distillate and aged whiskey."

9. Likewise, on the same day, during an earnings call held by the Company to discuss its financial results for the third quarter of the 2023 Fiscal Year (the "Q3 2023 Earnings Call"), the Individual Defendants dismissed analyst concerns over whether the Company had experienced "inventory building" and whether "whiskey pricing might be under pressure," instead asserting

that "***on our inventories . . . [MGPI is] not seeing anything today that would tell us that we, as a company, are imbalanced in that particular regard.***"[1]

10. These statements concerning the strength of consumer demand for the Company's products, as well as the health of its inventory levels, resulted in significant financial gains for MGP. Notably, MGP's stock price increased by a substantial 30%, from a price per share at the start of the Relevant Period of roughly $95 to a high of over $123 per share at the close of trading on August 14, 2023.

11. However, the Individual Defendants' statements concerning the Company's inventory levels and demand for its products were materially false. While the Individual Defendants conveyed to investors that MGP was immune from the issues plaguing the rest of the alcohol industry, the Company was indeed suffering from the very same inventory and demand level incongruities. Moreover, even though the Individual Defendants were aware that the Company's inventory levels were substantially higher than existing consumer demand, they instructed MGP employees to continue to produce barrels of alcohol.

12. As a result of the decreased demand for MGP products in conjunction with the Company's sustained production of alcohol, MGP's inventory levels reached unprecedented volumes. This in turn created a logistical conundrum in terms of physical storage of MGP products, which was further intensified as the Individual Defendants refused all requests to decrease production. Nevertheless, these facts were consistently concealed from investors. As late as August 1, 2024, when the Company hosted an earnings call to discuss its financial results for the second quarter of the fiscal year ended December 31, 2024 (the "2024 Fiscal Year") (the "Q2 2024 Earnings Call"), the Individual Defendants continued to convey to investors that the alcohol

[1] Unless otherwise stated, all emphasis is added.

industry's inventory issues were not applicable to the Company. Notably, Defendant Bratcher noted during the Q2 2024 Earnings Call that "***our inventory is exactly where we need -- it has been exactly where we needed it.*** And we continue to monitor it on a daily basis."

13. The truth began to fully emerge on October 17, 2024, and later on October 31, 2024. On October 17, 2024, the Company issued a press release pre-announcing its third quarter financial results for the 2024 Fiscal Year (the "Q3 2024 Preliminary Press Release"), which the Company also filed with the SEC on Form 8-K. The Q3 2024 Preliminary Press Release reported that the Company expected its sales to decline by 24% from the same quarter the previous year, and also reduced its guidance.

14. In stark contrast to earlier representations to investors, Defendant Bratcher explained in the Q3 2024 Preliminary Press Release that "[s]oft alcohol spirits category trends and elevated industry-wide whiskey inventories are putting greater than expected pressure on our brown goods business with a larger impact on our smaller, craft customer base." Defendant Bratcher added that "[w]e expect these industry headwinds to persist at least through the rest of the year and will share details about our 2025 outlook with our fourth quarter 2024 earnings release."

15. On this news, the price of MGP stock fell $24.07 per share over the course of three trading days, or nearly 30%, from a closing price of $81.57 per share on October 17, 2024, to close at a price of $57.50 per share on October 22, 2024.

16. On October 31, 2024, the Company issued another press release concerning its third quarter financial results for the 2024 Fiscal Year (the "Q3 2024 Earnings Release"), which the Company also filed with the SEC on Form 8-K. The Q3 2024 Earnings Release revealed that, as the result of "the softening American whiskey category trends and elevated industry-wide barrel

inventories," the Company needed to "further lower our net aging whiskey put away, scale down our whiskey production, and optimize our cost structure to mitigate lower production volumes." On an earnings call with investors that same day (the "Q3 2024 Earnings Call"), Defendant Bratcher admitted that "slower growth and higher inventories are leading to lower demand, lower prices and reduced visibility on our contract distilling sales."

17. On this news, the price per share of MGP stock fell $10.79, or roughly 19.2%, from closing at a price of $56.31 per share on October 30, 2024, to close at a price of $45.52 per share on November 1, 2024.

18. Throughout the Relevant Period, in breach of their fiduciary duties owed to MGP, the Individual Defendants willfully or recklessly caused the Company to make materially false and/or misleading statements that failed to disclose, *inter alia*, that: (1) despite their claims, the Individual Defendants did not have a good sense as to the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of an Equity Incentive Plan (the "2024 Incentive Plan") (detailed herein); and (5) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

19. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

20. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing MGP to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations. Indeed, between March 2024 and July 2024, approximately 128,360 shares of MGP common stock were repurchased at artificially inflated prices, costing the Company approximately $10 million. As the Company's stock was actually worth only $49.04 per share, the price at which it was trading when markets closed on October 31, 2024, after the corrective disclosures, the Company overpaid for repurchases of its own stock by approximately $3.7 million in total.

21. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while five of the Individual Defendants engaged in improper insider sales, netting total proceeds of approximately $14.5 million.

22. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

23. In light of the Individual Defendants' misconduct—which has subjected the Company, two of its former President/Chief Executive Officers ("CEO"), and its Chief Financial Officer ("CFO") to the Securities Class Action, and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

24. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and

misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of Defendant Colo's, Defendant Bratcher's, and Defendant Gall's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

25. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R.§240.10b-5), Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

26. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

27. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

28. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because MGP is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial

compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

**Plaintiffs**

29. Plaintiffs are current shareholders of MGP. Plaintiffs have continuously held shares of MGP common stock at all relevant times.

**Nominal Defendant MGP**

30. MGP is a Kansas corporation with principal executive offices at 100 Commercial Street, Atchison, Kansas, 66002. MGP common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "MGPI."

**Defendant Colo**

31. Defendant Colo served as the Company's President, CEO, and as a Company director from May 2020 until December 2023.

32. The proxy statement that the Company filed with the SEC on April 12, 2023 (the "2023 Proxy Statement") stated the following about Defendant Colo:

> Mr. Colo has been the Company's Chief Executive Officer since May 2020 and the President since March 2020. He also served as the Company's Chief Operating Officer from March 2020 to May 2020. Prior to joining the Company, he served as President, Chief Executive Officer and a director of SunOpta, Inc., a leading global company focused on natural food, ingredient sourcing, organic food, and specialty foods, from February 2017 to March 2019. He served as Executive Vice President and Chief Operating Officer of Diamond Foods, Inc. from 2013 until March 2016. He joined Diamond Foods in 2012 as Executive Vice President of Global Operations and Supply Chain. For the three years prior to joining Diamond Foods, Mr. Colo served as an independent industry consultant, focusing on organizational optimization and planning. From 2003 to 2005, he served as President of ConAgra Food Ingredients. Before his employment at ConAgra Foods, Mr. Colo spent several years with Nestle-Purina Pet Care Company in roles of increasing responsibility, including Vice President of Supply for the company's Golden Products Division and Vice President of Store Brands and Venture Development. He also served two years as President of the American Dehydrated Onion and Garlic Association. Mr. Colo's qualifications to serve on the Board include his extensive management experience and his experience in the food industry, and the insights he brings from his service as an officer of the Company.

**Defendant Bratcher**

33. Defendant Bratcher served as the Company's President, CEO, and as a Company director from January 2024 until December 2024. Prior to becoming CEO, Defendant Bratcher served as the Company's Chief Operating Officer from July 2021 until December 2023.

34. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bratcher made the following sale of Company common stock:

| **Date** | **Number of Shares** | **Avg. Price/ Share ($)** | **Proceeds ($)** |
|---|---|---|---|
| April 1, 2024 | 1,506 | $85.35 | $43,187 |

Thus, in total, before the fraud was exposed, Defendant Bratcher sold 1,506 shares of Company stock on inside information, for which he received approximately $43,187 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

35. The proxy statement that the Company filed with the SEC on April 9, 2024 (the "2024 Proxy Statement") stated the following about Defendant Bratcher:

> Mr. Bratcher is our Chief Executive Officer and President, a role he assumed on January 1, 2024. Mr. Bratcher served as our Chief Operating Officer from July 2021 to December 2023, and as President of Branded Spirits since our merger with Luxco, Inc. in April 2021 to December 2023. Prior to the Luxco merger, Mr. Bratcher served in several leadership roles at Luxco since his hire in 1998 as Director of Operations. He most recently served as President of Luxco, from 2013 until the April 2021 merger with Luxco. Before joining Luxco, Mr. Bratcher served in financial and operational roles for a number of consumer product companies, including serving five years as Controller and then Director of Operations for the international spirits company Allied Domecq, the second-largest spirits company in the world at the time. Mr. Bratcher's qualifications to serve on our Board include his extensive leadership experience and his experience in the beverage and alcohol

> industry, and the insights into our operations, management, and culture he brings from his service as our Chief Executive Officer and President.

**<u>Defendant Gall</u>**

36. Defendant Gall has served as the Company's Vice President of Finance and CFO since April 2019. As of January 1, 2025, Defendant Gall also has been serving as the interim President and CEO of the Company.

37. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Gall made the following sales of Company common stock:

| **Date** | **Number of Shares** | **Avg. Price/ Share ($)** | **Proceeds ($)** |
|---|---|---|---|
| February 12, 2024 | 1,916 | $85.44 | $163,703 |
| February 19, 2024 | 734 | $90.89 | $66,713 |

Thus, in total, before the fraud was exposed, Defendant Gall sold 2,650 shares of Company stock on inside information, for which he received approximately $230,416 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme

38. The "Executive Team" page of the Company's website[2] stated the following about Defendant Gall:

> Brandon Gall is Vice President of Finance and Chief Financial Officer of MGP and has served in this role since April 2019. In this role, Mr. Gall oversees the Company's accounting, business development, financial planning and analysis, treasury, investor relations, tax, and IT functions. Mr. Gall joined the Company in 2012 and has advanced through a steady progression of leadership roles, including Director of Financial Planning and Analysis, Director of Supply Chain Finance, Director of Business Development, and Corporate Controller.

[2] https://ir.mgpingredients.com/company-information/executive-team

> Prior to joining MGP, Mr. Gall worked at Errand Solutions, Chicago as director of finance and human resources. From 2005 to 2010, Mr. Gall served at Credit Suisse Securities in various analyst and associate roles and earned numerous securities licenses including the Series 7, Series 63 and Series 66 licenses.
>
> Mr. Gall holds a bachelor's degree of business administration from Miami University and a master's degree in business administration from the University of Chicago. He is also a certified public accountant.

**<u>Defendant Clark</u>**

39. Defendant Clark served as a Company director from June 2021 to May 2025. During that time, she also served as the Chair of the Audit Committee, and as a member of the Human Resources and Compensation Committee (the "Compensation Committee") and the Nominating and Governance Committee.

40. The 2024 Proxy Statement stated the following about Defendant Clark:

> Ms. Clark has been the Senior Vice President of Enterprise Finance at Brunswick Corporation (NYSE:BC), a leading global designer, manufacturer, and marketer of recreational marine products, since May 2022. She served as the Chief Financial Officer of Brunswick Boat Group, a division of Brunswick Corporation, from March 2019 to May 2022. From August 2018 to November 2018, she was the Chief Financial Officer of Lifeway Foods, Inc., a manufacturer and marketer of beverages and dairy products. From January 2016 to August 2018, she was the Chief Financial Officer – Coveris North American Food & Consumer Flexibles / Chief Transformation Officer of Coveris Americas, a leading producer of flexible packaging. From 1999 to 2015, she was employed by Kraft Foods, with increasing levels of responsibility, most recently as Director of Finance – Grocery Business. From 1997 to 1999, she was a senior auditor with Grant Thornton LLP. Ms. Clark's qualifications to serve on our Board include her significant financial, accounting, and public company leadership experience.

**<u>Defendant Gerke</u>**

41. Defendant Gerke has served as a Company director since June 2021. He also serves as the Chair of the Compensation Committee, and as a member of the Audit Committee and the Nominating and Governance Committee.

42. According to the Schedule 14A the Company filed with the SEC on April 21, 2025 (the "2025 Proxy Statement") stated the following about Defendant Gerke:

Relevant Expertise

- **Adept at driving strategic changes and operational excellence across business cycles**, as President and CEO of Embarq and Executive Vice Chairman of CenturyLink, Mr. Gerke provided strategic and operational leadership at a challenging time when the traditional voice business was rapidly transforming into a high speed data business. At H&R Block, a global consumer tax services provider, Mr. Gerke was deeply involved in many strategic, operational, and human capital initiatives during his tenure as General Counsel, Chief Administrative Officer, and Interim CEO.

- **Established leader in legal, regulatory, and risk management areas** having served as General Counsel of four publicly traded companies. Mr. Gerke has been intimately involved with the strategic and operational aspects of a varied set of significant and pivotal challenges. This legal expertise is supplemented by having had lead responsibility for regulatory and governmental affairs at three separate publicly traded companies.

- **Broad expertise in strategic M&A and business development** having served on four public company boards in addition to serving in a multitude of senior executive positions detailed below. Mr. Gerke's experience is further informed by nearly a decade of private practice experience.

**Defendant Lux**

43. Defendant Lux has served as a Company director since June 2021. Since January 2024, he also serves as the Chairman of the Board. According to the 2025 Proxy Statement, as of March 21, 2025, Defendant Lux beneficially owned 7,598,219 shares of the Company's common stock, which represents 35.7% of all shares of Company common stock, making Defendant Lux the controlling shareholder over matters voted on by common stock shareholders.

44. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Lux made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| May 10, 2023 | 10,000 | $83.00 | $829,969 |
| May 13, 2023 | 22,000 | $82.84 | $1,814,934 |
| June 9, 2023 | 2,005 | $101.69 | $203,888 |
| June 12, 2023 | 8,000 | $101.56 | $809,410 |
| May 14, 2024 | 20,000 | $82.30 | $1,639,018 |
| May 15, 2024 | 15,000 | $81.90 | $1,213,706 |

Thus, in total, before the fraud was exposed, Defendant Lux sold 77,005 shares of Company stock on inside information, for which he received approximately $6.5 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

45. The 2025 Proxy Statement stated the following about Defendant Lux:

Relevant Expertise

- **Accomplished beverage industry executive and operator** who served as the President and CEO of Luxco, a leading branded spirits company, from 1991 until its sale to MGP in 2021, and as Chairman of Luxco from 2010 until March 2021. Over his four-decade tenure at Luxco, he oversaw all aspects of the business, including production, marketing, sales, and its national distribution network, helping the company grow into a leading producer, bottler, importer, and marketer with a diverse portfolio of alcohol spirits brands.

- **Expertise in portfolio expansion and innovation**, having led Luxco through crucial growth milestones to achieve a comprehensive national footprint. In 2011, Mr. Lux led Luxco's acquisition of Paramount Distillers, a Cincinnati-based distiller, and its subsidiary Meier Wine Cellars, in a transaction designed to expand Luxco's footprint into new geographic markets, and expand into non-alcoholic beverages. In 2018, Mr. Lux oversaw the development and opening of Luxco's first whiskey distillery in Bardstown Kentucky to capitalize on the expanding whiskey category.

- **Extensive leadership and strategic planning experience** as Mr. Lux led Luxco for three decades before spearheading its sale to MGP in 2021. As MGP's Chairman of the Board, he has worked tirelessly to ensure the seamless integration of all of Luxco's brand and assets, helping transform MGP into a multifaceted, diversified business with a higher-value portfolio of branded spirits and national distribution footprint.

**Defendant Michelson**

46. Defendant Michelson served as a Company director from May 2022 to April 2025. During that time, she also served as a member of the Audit Committee, Compensation Committee, and Nominating and Governance Committee.

47. The 2025 Proxy Statement stated the following about Defendant Michelson:

> Ms. Michelson has been Chief People Officer at tms, a Havi Company, since December 2023. tms is a privately-owned company that unites technology, marketing, and sourcing to deliver change to leading brands. Previously, she was Vice President of Human Resources at CVS Health Corporation (NYSE: CVS), an American healthcare company, from November 2022 to December 2023. From March 2022 to November 2022, she was the Chief People Officer of AHEAD, Inc., a digital business platform builder. From June 2019 to March 2022, she was employed by United Airlines as Managing Director of HR for the President, Chief Human Resources Officer and Chief Customer Officer. From December 2015 to June 2019, she worked for Molson Coors Beverage Company, in several positions of increasing responsibility, including as Senior HR Commercial Lead for MillerCoors. From 2012 to 2015, she was Vice President, Customer Experience & Organizational Effectiveness of The Y of Metropolitan Chicago. Prior to that, she was employed by Beam Global Spirits & Wine from 2010 to 2012 as Director, Marketing Strategy. From 2005 to 2009, she served as Senior Manager, Strategy—Tropicana Beverages, of PepsiCo. From 2000 to 2005, she served as Director, Strategy, Planning & Analysis for the Chicago Tribune Company. From 1999 to 2000, she worked for Ernst & Young LLP as a Manager in its Mergers and Acquisitions practice group. Ms. Michelson's qualifications to serve on our Board include her background in strategy and marketing for multiple consumer brands, her extensive experience in all aspects of human resources management, her alcohol beverage industry experience, and her leadership experience.

**Defendant Mingus**

48. Defendant Mingus has served as a Company director since June 2020. She also serves as a member of the Compensation Committee and the Nominating and Governance Committee.

49. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Mingus made the following sales of Company common stock:

| **Date** | **Number of Shares** | **Avg. Price/ Share ($)** | **Proceeds ($)** |
|---|---|---|---|
| May 25, 2023 | 608 | $99.71 | $60,624 |
| May 26, 2023 | 400 | $97.34 | $38,937 |
| May 30, 2023 | 3,692 | $94.92 | $350,436 |
| June 9, 2023 | 1,096 | $101.06 | $110,762 |
| July 3, 2023 | 2,268 | $106.61 | $241,758 |
| August 1, 2023 | 320 | $112.62 | $36,038 |
| August 2, 2023 | 324 | $113.19 | $36,674 |
| August 8, 2023 | 1,215 | $122.17 | $148,437 |
| September 1, 2023 | 591 | $120.32 | $71,109 |
| October 2, 2023 | 383 | $104.69 | $40,096 |
| November 1, 2023 | 108 | $93.92 | $10,143 |
| December 4, 2023 | 1,061 | $90.63 | $96,158 |
| January 2, 2024 | 354 | $99.21 | $35,120 |
| February 15, 2024 | 113 | $90.00 | $10,170 |
| May 22, 2024 | 2,430 | $78.88 | $191,678 |
| August 23, 2024 | 2,764 | $90.46 | $251,194 |
| September 4, 2024 | 100 | $90.02 | $9,002 |

Thus, in total, before the fraud was exposed, Defendant Mingus sold 17,827 shares of Company stock on inside information, for which she received approximately $1.7 million in total proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

50. The 2025 Proxy Statement stated the following about Defendant Mingus:

Relevant Expertise

- **Strategic thinker with branding expertise** to help lead the Company through transformative changes, including the acquisition and integration of Luxco, and the refinement and advancement of MGP's distilling and ingredients businesses. Ms. Mingus has worked with several public companies, national associations, and an advertising agency as the owner of Torpa Design, a company specializing in all facets of graphic design, interior design, and exterior design. Her career in design has enabled her to provide insights on MGP's branded spirits strategy and operations.

- **Respected leader in the Atchison community**, including membership on the boards of the Evah C. Cray Historical Museum, the Atchison Amelia Earhart Foundation, and the Cray Medical Research Organization at the University of Kansas Medical Center. Ms. Mingus's leadership is instrumental in helping MGP maintain its strong ties to the Atchison, Kansas, community.

- **Custodian of MGP's legacy** as the fourth generation of the founding Cray family to serve MGP. Ms. Mingus's understanding of MGP's identity and traditions, as well her institutional knowledge, provide an invaluable perspective to the Board and in setting Company's strategy for the future.

**Defendant Rauckman**

51. Defendant Rauckman has served as a Company director since June 2021. He also serves as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee and the Compensation Committee.

52. The 2025 Proxy Statement stated the following about Defendant Rauckman:

Relevant Expertise

- **Strategic thinker with branding expertise** to help lead the Company through transformative changes, including the acquisition and integration of Luxco, and the refinement and advancement of MGP's distilling and ingredients businesses. Ms. Mingus has worked with several public companies, national associations, and an advertising agency as the owner of Torpa Design, a company specializing in all facets of graphic design, interior design, and exterior design. Her career in design has enabled her to provide insights on MGP's branded spirits strategy and operations.

- **Respected leader in the Atchison community**, including membership on the boards of the Evah C. Cray Historical Museum, the Atchison Amelia Earhart Foundation, and the Cray Medical Research Organization at the University of Kansas Medical Center. Ms. Mingus's leadership is instrumental in helping MGP maintain its strong ties to the Atchison, Kansas, community.

- **Custodian of MGP's legacy** as the fourth generation of the founding Cray family to serve MGP. Ms. Mingus's understanding of MGP's identity and traditions, as well her institutional knowledge, provide an invaluable perspective to the Board and in setting Company's strategy for the future.

**Defendant Seaberg**

53. Defendant Seaberg has served as a Company director since August 2009. She also serves as a member of the Compensation Committee and the Nominating and Governance Committee. She also served as the Chair of the Board from 2014 through December 2024. According to the 2025 Proxy Statement, as of March 21, 2025, Defendant Seaberg beneficially owned 297 shares of the Company's preferred stock, which represents 68% of all shares of Company preferred stock, making Defendant Seaberg the controlling shareholder over matters voted on by preferred stock shareholders.[3]

---

[3] According to the Form 10-K filed with the SEC on February 26, 2025, holders of the Company's preferred stock "***are entitled to elect five of our nine directors and only holders of our Preferred Stock are entitled to vote with respect to a merger, dissolution, lease, exchange or sale of substantially all of our assets, or on an amendment to the Articles of Incorporation***, unless such action would increase or decrease the authorized shares or par value of the Common or Preferred Stock, or change the powers, preferences or special rights of the Common or Preferred Stock so as to affect the holders of Common Stock adversely. Generally, our Common Stock and Preferred

54. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Seaberg made the following sales of Company common stock:

| **Date** | **Number of Shares** | **Avg. Price/ Share ($)** | **Proceeds ($)** |
|---|---|---|---|
| May 25, 2023 | 608 | $99.71 | $60,624 |
| May 26, 2023 | 400 | $97.34 | $38,937 |
| May 30, 2023 | 3,692 | $94.92 | $350,436 |
| June 20, 2023 | 985 | $101.70 | $100,175 |
| July 3, 2023 | 4,644 | $106.59 | $495,015 |
| July 5, 2023 | 7,334 | $106.58 | $781,658 |
| August 2, 2023 | 880 | $113.57 | $99,942 |
| September 5, 2023 | 853 | $117.22 | $99,989 |
| October 2, 2023 | 1,414 | $103.46 | $146,195 |
| October 3, 2023 | 9,204 | $102.24 | $940,135 |
| November 1, 2023 | 1,073 | $93.20 | $100,004 |
| December 4, 2023 | 1,110 | $90.09 | $100,000 |
| January 2, 2024 | 2,544 | $99.09 | $253,576 |
| January 3, 2024 | 9,345 | $96.30 | $899,924 |
| February 16, 2024 | 3,329 | $90.11 | $299,976 |
| August 23, 2024 | 12,092 | $90.64 | $1,096,141 |
| September 4, 2024 | 1,109 | $90.14 | $99,965 |

Thus, in total, before the fraud was exposed, Defendant Seaberg sold 60,616 shares of Company stock on inside information, for which she received approximately $6 million in total proceeds.

Stock vote as separate classes on all other matters requiring stockholder approval."

Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

55. The 2025 Proxy Statement stated the following about Defendant Seaberg:

Relevant Expertise

- **Strategic leader, driving MGP's evolution from a predominantly commodity company into an emerging branded spirits powerhouse.** Ms. Seaberg's decades of strategic leadership at MGP was capped by the Company's transformative acquisition of Luxco in 2021. As Chairman of the Board, she led the Board through the deal's negotiation and execution. The transaction transformed MGP, which had already been one of the country's largest distillers, into a leading alcohol spirits company with a diverse portfolio of brands, extensive operational capabilities, and a sales and distribution network that spans across all 50 U.S. states, as well as internationally.

- **Deep familiarity with MGP's business**, given her 15 years on the Board, including ten years as Chairman of the Board from 2014 to 2024. Ms. Seaberg oversaw the Company during crucial periods of growth with nearly $1 billion of strategic M&A activity between 2009 and 2023, including the 2011 purchase of the Lawrenceburg distillery. Ms. Seaberg's institutional knowledge of the Company and its operations has been instrumental in setting the Company's long-term strategy.

- **Active community leader in the local and state communities.** She is currently a member of the Heartland Chapter of the National Association of Corporate Directors and the Kansas City Chapter of Women Corporate Directors and is Vice Chair of the Cray Medical Research Organization at the University of Kansas, among other appointments. She has received numerous honors, including the Atchison area Chamber of Commerce's Hall of Fame award in 2015 and the Catalyst Award at the 2022 Hall of Fame at the University of Kansas Health System.

**<u>Defendant Siwak</u>**

56. Defendant Siwak has served as a Company director since May 2022. He also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee.

57. The 2025 Proxy Statement stated the following about Defendant Siwak:

Relevant Expertise

- **Proven food & beverage industry executive**, with a track record of scaling consumer businesses, improving their profitability, and propelling growth. Mr. Siwak oversaw over $6 billion in M&A transactions and $300 million in capital expansion projects during his tenure as President and Chief Business Officer of Ferrero North America, one of the world's largest sweet-packaged food companies. Under his leadership, Ferrero acquired Ferrara Candy, a large confectioner, as well as Nestle's candy business. Within three years of the acquisition, he helped improve Ferrara's profitability by 150% and turned around Nestle's candy business from double digits sales declines to double digits growth.

- **Distinguished entrepreneur**, with demonstrated prowess for all stages of the business life cycle. Mr. Siwak co-founded TRG Accessories, a manufacturer and distributor of travel gear for Swiss Army, Timberland and Golf Brands. He led the company from inception to its $150 million sale to Centric Group. For his leadership at TRG, Mr. Siwak was named the Ernst & Young Entrepreneur of the Year. As a seasoned private equity executive at Mindseye Group and L Catterton, Mr. Siwak accelerated value creation at CPG and consumer service portfolio companies by identifying weaknesses in their operational processes, designing and implementing growth strategies, and building high-performance management teams. His impact culminated in a string of successful exits. Mr. Siwak has continued his entrepreneurial ventures with the launching of private equity group Encore Management, based in St. Louis, Missouri. Encore invests in highly fragmented consumer service industries, executing an acquire, integrate, operationalize, and grow business model. Encore's three portfolio companies operate in the home health, medspa, and pet service industries.

- **Expert manager of complex product portfolios.** As the CEO of Ferrara Candy Company, Mr. Siwak was responsible for integrating its distinct candy brands with those of Farley's & Sathers, following their 2012 merger into a single cohesive entity. In 2018, Mr. Siwak was responsible for the successful integration of Nestle's US candy business after its acquisition by Ferrara's parent, Ferrero SpA.

**<u>Relevant Non-Parties</u>**

58. The amended consolidated complaint filed in the Securities Class Action in this Court (the "SAC") (Securities Class Action, ECF No. 61) incorporates statements from former

employees of MGP who offered their experiences. The following are the former employees whose statements are referenced throughout this complaint before this Court.

***FE-1***

59. FE-1[4] previously served as a Warehouse Logistics and Quality Manager for MGP from January 2023 to July 2024. As such, FE-1 was directly responsible for the Company's logistics, quality control, and inventory management at MGP's two primary storage facilities in Williamstown, Kentucky and Lawrenceburg, Indiana. Among FE-1's responsibilities were the management of Company barrel storage and sales, the movement of alcohol from production facilities to barreling facilities, and the testing of spirits prior to barreling. Throughout the course of his employment at MGP, FE-1 reported to the Company's leadership team, notably Defendants Bratcher and Gall. Prior to his voluntary exit from the Company, FE-1 was selected and slated to attend leadership training with Defendant Gall. Notably, FE-1 has stated that he engaged in weekly calls each Wednesday with the Company's senior executives, including but not limited to Defendants Bratcher and Gall.

***FE-2***

60. FE-2 previously served as the Company's Executive Vice President of Operations from June 2024 to October 2024. In this role, FE-2's primary responsibilities were the building of a professional supply chain and all operational safety related to engineering, manufacturing, and supply chain logistics. Notably, FE-2 reported directly to Defendant Bratcher.

***FE-3***

[4] Former MGP employees are herein referred to as "FE-#" and are all referenced using masculine pronouns to maintain their confidentiality.

61. FE-3 previously served as a Director of Sales Operations for the Company's Distilling Solutions from January 2023 to October 2023. Before that, FE-3 worked for the Company in a variety of positions since 2015, including but not limited to Supply Chain Coordinator and Corporate Supply Chain Planning Manager. In his capacity as Director of Sales Operations for Distilling Solutions, FE-3 possessed multiple responsibilities, including overseeing customer service, tracking financials, updating sales forecasts, and running new business developments. Additionally, FE-3 attended quarterly meetings with Defendants Colo and Gall.

***FE-4***

62. FE-4 previously served as a Customer Service Specialist for the Company's Distilling Solutions segment from June 2022 until January 2024. As such, FE-4 was responsible for the onboarding of new whiskey customers.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

63. By reason of their positions as controlling shareholders, officers, directors, and/or fiduciaries of MGP and because of their ability to control the business and corporate affairs of MGP, the Individual Defendants owed MGP and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MGP in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MGP and its shareholders so as to benefit all shareholders equally.

64. Each controlling shareholder, director, and officer of the Company owes to MGP and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

65. The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of MGP, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

66. To discharge their duties, the controlling shareholders, officers, and directors of MGP were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

67. Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors, and officers of MGP, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised MGP's Board at all relevant times.

68. As controlling shareholders, senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management,

earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

69. To discharge their duties, the controlling shareholders, officers, and directors of MGP were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers, and directors of MGP were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Kansas and the United States, and pursuant to MGP's own Code of Conduct (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how MGP conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of MGP and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MGP's operations would comply with all applicable laws and MGP's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

70. Each of the Individual Defendants further owed to MGP and the shareholders the duty of loyalty requiring that each favor MGP's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

71. At all times relevant hereto, the Individual Defendants were the agents of each other and of MGP and were at all times acting within the course and scope of such agency.

72. Because of their advisory, executive, managerial, directorial, and controlling positions with MGP, each of the Individual Defendants had access to adverse, non-public information about the Company.

73. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MGP.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

74. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

75. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, the aiding and abetting thereof, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

76. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of MGP was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

77. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

78. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MGP and was at all times acting within the course and scope of such agency.

## MGP'S CODE OF CONDUCT

79. The Code of Conduct states that the Code of Conduct "is applicable to all directors, officers, and employees of" the Company. The Code of Conduct continues, stating that the Company is "committed to conducting business with the highest ethical standards, integrity, and social responsibility."

80. In a section titled "Financial Integrity and Accurate Business Records," the Code of Conduct states the following, in relevant part:

> MGPI is a public company that is committed to providing investors with full, fair, accurate, timely, and understandable disclosure in its financial statements and public communications. Employees responsible for these matters must: • comply with generally accepted accounting principles at all times; • maintain a system of internal controls that will provide reasonable assurances to management that all transactions are properly recorded; • maintain books and records that accurately and fairly reflect our transactions; • prohibit the establishment of any undisclosed or unrecorded funds, assets, or liabilities; • maintain a system of disclosure controls and procedures that will provide reasonable assurances to management that material information about us is made known to management, particularly during the periods in which our financial statements are being prepared; and • present information in our financial statements and public communications in a full, fair, accurate, timely, clear, and understandable manner.

81. In a section titled "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> A "conflict of interest" exists when a person's private interest interferes in any way with the interests of the Company. You should avoid situations that may involve, or create the perception of, a conflict of interest.

82. In a section titled "Compliance with the Law," the Code of Conduct states the following, in relevant part:

> If we do not comply with the law, we will create problems for ourselves as well as those around us. Illegal actions damage reputations and erode the confidence and trust that others have placed in us. Accordingly, it is our policy that all laws be obeyed, however insignificant, and that this requirement must be placed ahead of our own personal interests and the Company's operating results. The following are generalized comments on certain areas of the law and Company policies that you should always keep in mind.
>
> * * *
>
> Improper Use of Confidential Information. Treat all non-public information about the Company as confidential. Confidential information is an item of Company property to be used only for the proper conduct of the Company's business. You may not use it or allow others to use it to promote outside interests. You may share confidential information only with those who both have the authorization to access it and a need to know the information in order to do their jobs. Inappropriate, intentional, or inadvertent disclosures may harm the Company's business or its stockholders. These improper disclosures can damage customer relationships, give our competitors an edge, or result in illegal stock trading profits generated at the expense of the uninformed. For more information, see the Employee Handbook.
>
> Trading in MGPI's Stock and Other Securities. You must comply with insider trading and securities laws that prohibit buying or selling a company's securities while aware of material nonpublic information about a company or providing material nonpublic information to another person who trades on the basis of that information or passes that information to a third party who trades. For more information, see the Company's Insider Trading Policy.

83. In a section titled "Reporting Violations," the Code of Conduct states the following, in relevant part:

> Any supervisor or manager who observes conduct that may violate this Code of Conduct or who learns of a violation or potential violation of this Code of Conduct must promptly report the matter to the General Counsel.
>
> All violations of this Code of Conduct will be reported to the General Counsel, who will cause an appropriate investigation of the violation to be made as confidentially as possible. Any concerns reported to the General Counsel about financial accounting practices or the Company's system of internal accounting controls will also be reported to the Chair of the Audit Committee.

84. In a section titled "Administration," the Code of Conduct states the following:

> The Audit Committee is responsible for setting the standards set forth in this Code of Conduct and may update it from time to time. Any waiver of this Code of Conduct for members of the Board of Directors or executive officers may be made only by the Audit Committee and will be disclosed to the public as required by law or the rules of the Nasdaq Stock Market, when applicable. Waivers of this Code for other employees may be made only by our Chief Executive Officer or Chief Financial Officer and may be reported to the Audit Committee.

85. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, the aiding and abetting thereof, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Ethics.

## MGP'S AUDIT COMMITTEE CHARTER

86. According to the Audit Committee Charter, the "purpose" of the Audit Committee is "to assist the Board in fulfilling its oversight responsibilities with respect to (i) accounting and

financial reporting processes, (ii) financial statement audits,1 and (iii) monitoring significant risk exposures."

87. The Audit Committee Charter delineates the duties and responsibilities of the committee as follows, in relevant part:

> **(a)** Review of Performance and Charter. The Committee will annually review its own performance and policies and procedures, including this Charter.
>
> **(b)** Selection, Compensation, and Replacement of Independent Auditor. The Committee has sole authority to appoint, retain (with subsequent submission to the Company's stockholders for ratification), compensate, evaluate, oversee, and terminate the firm of independent registered public accountants serving as the Company's independent auditor (the "Independent Auditor"). The Committee will have oversight responsibility over the work of the Independent Auditor, and the Independent Auditor will report directly to the Committee.
>
> * * *
>
> **(d)** Independent Auditor Independence and Quality Control Procedures. The Committee will review and discuss the Independent Auditor's independence and quality control procedures with the Independent Auditor, which will include:
>
> > (i) At least annually, review of a written statement delineating all relationships between the Independent Auditor and the Company, including the matters set forth in applicable Public Company Accounting Oversight Board ("PCAOB") standards. The review will include an active dialogue with the Independent Auditor with respect to any disclosed relationships or services that may, in the view of the Committee, impact the objectivity and independence of the Independent Auditor. The Committee will take appropriate action in response to the Independent Auditor's report to satisfy itself of the Independent Auditor's independence.
> >
> > (ii) At least annually, review of a report by the Independent Auditor describing the Independent Auditor's internal quality-control procedures, any material issues raised by the most recent internal quality-control review, peer review, or PCAOB review of the Independent Auditor, or by any inquiry or investigation by governmental or professional authorities within the preceding five years, respecting one or more independent audits carried out by the Independent Auditor, and any steps taken to deal with such issues.
> >
> > (iii) Confirming that Independent Auditor complies with rotation requirements of the lead audit partner, as required by SEC rules, and

considering the rotation of the accounting firm serving as the Independent Auditor.

(iv) Review and approving the Company's hiring policies related to employees or former employees of the Independent Auditor.

**(e)** Oversight of the Audit. The Committee will review:

(i) The plan for and scope of the annual audit of the Company's financial statements.

(ii) The qualifications and performance of the Independent Auditor, including the lead audit partner.

(iii) The results of the annual audit, including any critical audit matters.

(iv) All critical accounting policies and practices to be used in the audit.

(v) Assurances provided by the Independent Auditor with respect to the compliance of the audit with the requirements of Section 10A(a) of the Exchange Act relating to the detection of certain illegal acts, the identification of certain related party transactions, and an evaluation of the Company's ability to continue as a going concern.

(vi) The manner in which the Company's internal accounting team works in connection with the Independent Auditor, including management's responses to recommendations made and plans for future audit coverage.

**(f)** Oversight of Financial Reporting, Financial Statements, and Published Statements. The Committee will:

(i) Review and discuss with management and the Independent Auditor the Company's financial statements and disclosures made in "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual and quarterly reports filed with the SEC on Form 10-K and Form 10-Q and the results of the Independent Auditor's review of the quarterly financial statements included in the Company's Quarterly Report on Form 10-Q.

(ii) Provide a recommendation to the Board as to whether the audited financial statements should be included in the Company's Annual Report on Form 10-K for the applicable fiscal year based on the review and discussions with management and the Independent Auditor relating to the annual financial statements and the audit.

(iii) Review and discuss with management earnings press releases, non-GAAP financial measures, earnings guidance, as well as financial

information provided to analysts and rating agencies. Such discussions may be done generally (e.g. as to the types of presentations made or the types of information disclosed).

(iv) Review and approve the audit committee report required by SEC rules in the Company's annual proxy statement.

(v) Review and discuss with management and the Independent Auditor the effect of regulatory and accounting initiatives on the Company's financial statements.

(vi) Discuss with the Independent Auditor any matters required to be discussed by applicable requirements of the PCAOB and the SEC, including the Independent Auditor's judgments about the quality, not just the acceptability, of the Company's accounting principles as applied in its financial reporting.

(vii) Discuss with management and the Independent Auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements; any significant changes made by management in the basic accounting principles and reporting standards used in the preparation of the Company's financial statements; all alternative treatments of financial information within generally accepted accounting principles ("GAAP") related to material items that have been discussed with management, including the ramifications of the use of such alternative disclosures and treatments and the treatment preferred by the Independent Auditor.

(viii) Discuss with the Independent Auditor any recommendations of the Independent Auditor with respect to internal controls and other financial matters, including any perceived weaknesses in the Company's internal controls, policies, and procedures, any special steps taken to address material control deficiencies, and any recommendations regarding disclosures about changes in internal control over financial reporting.

(ix) Discuss with the Independent Auditor management's report on internal control over financial reporting and the Independent Auditor's attestation of the report.

(x) Discuss with management any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting which could adversely affect the Company's ability to record, process, or summarize, and report financial data and any fraud, whether or not material, involving management or other employees who have a significant role in the Company's internal control over financial reporting.

(xi) Review and discuss with management and the Independent Auditor material written communications between management and the

Independent Auditor, such as (a) any engagement letter or independence letter, (b) any management letter, any schedule of unadjusted differences and a listing of adjustments and reclassifications not recorded, if any, and management's responses thereto, and (c) any reports on observations and recommendations on internal controls.

(xii) Review with management and the Independent Auditor any published reports or any correspondence from governmental agencies which raise material issues regarding the Company's accounting policies or financial statements.

* * *

**(h)** Internal Audit Matters. The Committee will:

(i) Review the appointment, responsibilities, compensation, performance, plan, and replacement of persons performing the internal audit function.

(ii) Receive reports directly from persons performing the internal audit function, including summaries of reports to management together with management's responses and follow up to these reports.

(iii) Periodically meet separately with persons performing the internal audit function, discussing any issues such persons believe warrant Committee attention.

The persons performing the internal audit function will have unfettered access to the Committee.

**(i)** Risk Assessment. Periodically, the Committee will:

(i) Discuss the Company's major enterprise risk exposures, including cybersecurity risks, and any steps Company management has taken to monitor, manage, and mitigate such exposures.

(ii) Review legal and regulatory matters that may have a significant impact on the financial statements, related Company compliance policies and programs and material reports or inquiries received from regulatory agencies.

88. In violation of the Audit Committee Charter, the Individual Defendants (as key officers and members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, the aiding and abetting thereof, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

***Company Background***

89. MGP, headquartered in Atchison, Kansas, produces, distills, and distributes alcoholic beverages and food ingredients. With distilleries in Kentucky, Kansas, Indiana, and Mexico, and bottling operations in Missouri, Ohio, and Northern Ireland, MGP Ingredients has the infrastructure and expertise to create on any scale.

90. The Company's business is split into three segments: Distilling Solutions, Branded Spirits, and Ingredient Solutions. Distilling Solutions consists of food grade alcohol to be used as an ingredient in food products, personal care products, cleaning solutions, and pharmaceuticals. Branded Spirits consists of premium plus, ultra-premium, super premium, premium, mid, and value branded distilled spirits for consumption.

91. The Company's products are sold either directly or through distributors to manufacturers and processors of finished packaged goods. Many of the Company's customers are businesses, although the Company's branded products may be sold directly to individuals. Among MGP's largest customers are Diageo Brands and Prichard's Distillery, who frequently purchase their spirits but proceed to store the barrels in the Company's warehouses, for a monthly fee.

92. MGP Ingredients' Branded Spirits portfolio covers a wide spectrum of brands in every segment, including iconic brands from Luxco. Founded in 1958 by the Lux Family, Luxco is a leading producer, supplier, importer and bottler of beverage alcohol products.

93. Luxco's award-winning spirits portfolio includes well-known brands from five distilleries: Bardstown, Kentucky-based Lux Row Distillers, home of Ezra Brooks, Rebel, Blood Oath, David Nicholson and Daviess County; Lebanon, Kentucky-based Limestone Branch Distillery, maker of Yellowstone Kentucky Straight Bourbon Whiskey, Minor Case Straight Rye Whiskey and Bowling & Burch Gin; Jalisco, Mexico-based Destiladora González Lux, producer of 100% agave tequilas, El Mayor, Exotico and Dos Primos; and MGP Ingredients' historic Ross & Squibb Distillery in Lawrenceburg, Indiana, where the Remus Straight Bourbon Whiskey and Rossville Union Straight Rye Whiskey are produced.

94. The Company's Distilling Solutions segment has proven to be its largest source of revenue and thus its most important operating segment. In 2022 and 2023, the Distilling Solutions segment represented over 54% of the Company's revenue. Moreover, the brown goods business subsegment of the Distilling Solutions segment represented over 64-80% of the segment's sales throughout the Relevant Period. Overall, the brown goods subsegment was MGP's most profitable between 2021 and 2024.

95. The Company's Distilling Solutions segment generally operates through bill and hold arrangements as referenced above. Under such arrangements, the Company sells spirits to customers but stores the product in barrels in the Company's warehouses for an extended period of time. MGP generates revenue at two stages in this process, the first being a fee from the "fill" or when the Company fills the customer's barrels with the requisite spirit. MGP generates further revenue from the "pick" or the time at which Company ships the barrels of spirits to the customer.

96. In addition, the Company's Ingredient Solutions segment offers specialty proteins and starches that help customers harness the power of plants and provide a host of functional, nutritional, and sensory benefits for a wide range of food products.

***The Company Saw Increased Demand Due to the COVID-19 Pandemic That Quickly Fell as the Pandemic Ends***

97. The COVID-19 pandemic brought social isolation for many across the world, notably through systematic closure of bars, restaurants, and other spaces for social gathering. This isolation resulted in significant stress. Additionally, many taxpayers received stimulus checks to account for pandemic-induced lay-offs and to spur economic growth. As a result, many people began to consume alcohol in greater quantities than they had prior to the pandemic.

98. As a result of this uptick in drinking, liquor companies, including MGP, benefitted considerably throughout the pandemic. Notably, the Company's revenue leaped by 58.5% from fiscal year 2020 to fiscal year 2021, and a further 24.8% from fiscal year 2021 to fiscal year 2022. In order to properly take advantage of this boom in alcohol demand, the Company increased its production.

99. However, by the end of 2022, it was becoming increasingly clear that demand was beginning to slow and return to pre-pandemic levels. As such, at the beginning of the Relevant Period, and even before, the Company's inventory levels, as well as industry-wide demand, were at the top of investors' minds.

100. Nevertheless, throughout the Relevant Period, the Individual Defendants continued to convey to investors that the Company was "uniquely positioned" and immunized from the economic shocks affecting the alcohol industry.

101. As a result of this positive sentiment about the Company's financial trajectory in light of wider macroeconomic trends, MGP remained a positive outlier in the negatively trending

alcohol industry. At the start of the Relevant Period, analysts took note of this phenomenon, such as Wells Fargo which reported that there was "upside potential with ***ongoing Brown Goods demand momentum***." In a similar vein, Wedbush noted "***increasing concern that trends and overall demand for bourbon is normalizing due to slower growth***," but in the context of the Company, such concerns were "***simply not indicative of the overall strength in the category***."

102. As a result of the positivity surrounding the Company's financial resilience, the Company's stock rose substantially over the course of the next several trading days. MGP's common stock price increased by $6.01 per share, or roughly 6.3%, from a closing price of $95.42 per share on May 3, 2023 to close at $101.43 per share on May 8, 2023.

103. Throughout the Relevant Period, as the Individual Defendants continued to highlight the Company's supposed ability to capitalize on industry tailwinds, and analysts continued to reflect such representations in their reports about the Company. For instance, on May 18, 2023, Wedbush analysts revealed that they "recently hosted investor meetings with MGPI management, including CFO Brandon Gall," and that they "***walked away from the meetings with increased conviction on the long-term setup***" of the Company, which "***remain[ed] well positioned to benefit from top-down tailwinds including strong bourbon demand and premiumization***." Wedbush also observed the Company's future year customer commitments, stating "As it currently stands, ~75% of MGPI's new distillate is fully committed for the year, and for aged whiskey, ~50% is fully committed, which to provide context, compares to ~40% and 0% for each respective category historically."

104. Other analysts shared similar sentiments concerning these representations about the Company's financial trajectory. During the Relevant Period, Truist Securities stated that the Company has "incredibly strong visibility for the brown spirits business," including the

"surprise[]" that MGPI "already has a big jump on 2024." Truist believed that the Company's "stock has a long way to run." Likewise, Lake Street observed that the Company's positive "[d]emand [t]rends [p]ersist," which, based on the Individual Defendants' assurances, Lake Street "expect[ed] will persist for the foreseeable future."

105. As a result of the continued positivity as to the Company's positive financial prospects, the Company's stock rose substantially over the course of several trading days by $9.53 per share, or roughly 8.4%, from a closing price of $113.02 per share on August 2, 2023 to close at $122.55 per share on August 7, 2023.

106. On November 2, 2023, the Company issued a press release announcing its financial results for the third quarter of the 2023 Fiscal Year, which it also filed on Form 8-K with the SEC (the "Q3 2023 Earnings Release"). In addition to conveying confidence in the Company's financial prospects, the Q3 2023 Earnings Release announced that Defendant Colo would step down as CEO, effective December 31, 2023. The Q3 2023 Earnings Release further noted that Defendant Bratcher, the Company's then-COO, would assume the Company's CEO position.

***The Company's Inventory Was Much Higher and Much More Unsustainable Than Represented***

107. In actuality, the Company faced the same issues concerning demand and inventory which other alcohol companies had been experiencing. The true nature of the Company's inventory bloat is evidenced through testimony from former high-level employees of MGP. For instance, FE-1, in his role as Warehouse Logistics and Quality Manager, reported that as of early 2023, the rate at which MGP filled its barrels quickly outpaced the rate at which MGP transported barrels to customers which served as a "***major red flag***." SAC ¶ 58. FE-1 explained that this was the case because the increased rate of filling barrels coupled with decreasing transportation caused the Company to become "***screwed on space***." *Id.* Further, FE-1 explained that the Company had

invested in a new continuously-operating still, which only further increased the production of spirits and filling of barrels. *Id.*

108. The problems only worsened with the completion of the continuously-operating still, FE-1 reported that the Company "***. . . turned that bad boy on and were running it full bore***." This had the predictable result which FE-1 noted: "***[w]e were filling like gangbusters, and I kept telling management that we were running out of space***." *Id.*

109. FE-1 also reported on the actions of MGP's major customers, namely that Diageo and Prichard's distillery were reducing their transport orders of barrels from MGP warehouses. *Id.* ¶ 59. FE-1 further noted that the Company permitted some customers to renege on their contracts with the Company if demand declines. FE-1 stated that "***the brown goods sales definitely declined with contract fulfilling*** and MGPI was no longer the only kid on the block. There was a lot of competition that was popping up that drove some of the customers into a more boutique specialized bourbon." *Id.* Furthermore, FE-1 reported that roughly five months into his employment with the Company, he observed an uptick in the number of customers who got out of their contractual purchasing agreements.

110. FE-1 revealed how this further added to the inventory bloat, stating that throughout the Relevant Period, "***barrels just were not moving, and they were not getting picked***," but MGP management "kept production up at their distillery." *Id.* ¶ 61.

111. Notably, the Company's own internal documents reviewed in the Securities Class Action confirm this, with the spreadsheets showing that the Company was filling barrels much quicker than its customers were picking them up as early as ***January 2023***. *Id.* ¶ 88. As shown by the following chart below from the Securities Class Action regarding the Company's fills against picks for January through November 2023:

| 2023 Pick versus Fill Rate | | | | |
|---|---|---|---|---|
| Month | Pick | Fill | % Difference | Fill-to-Pick ratio |
| January | 12,971 | 31,356 | 141.74% | 2.42 |
| February | 15,535 | 25,807 | 66.12% | 1.66 |
| March | 16,619 | 29,789 | 79.25% | 1.79 |
| April | 13,421 | 31,031 | 131.21% | 2.31 |
| May | 14,373 | 30,621 | 113.05% | 2.13 |
| June | 15,752 | 34,702 | 120.30% | 2.20 |
| July | 12,781 | 31,309 | 144.97% | 2.45 |
| August | 14,439 | 34,715 | 140.43% | 2.40 |
| September | 11,064 | 13,960 | 26.17% | 1.26 |
| October | 14,493 | 28,964 | 99.85% | 2.00 |
| November | 13,451 | 36,566 | 171.85% | 2.72 |
| **TOTAL** | **154,899** | **328,820** | **212.28%** | **2.12** |

*Id.*

112. Additionally, the Company also prepared two presentations for its executives in November and December 2023 titled "Warehouse Capacity & Consolidation" (the "Consolidation Reports") which included, *inter alia*, a chart representing the average number of picks per month. *Id.* ¶ 90. The chart showed that there was an increase in the number of picks of picks by 31% and 24%, respectively, in 2021 and 2022, before showcasing a decrease of 16% in 2023 when compared to 2022. *Id.* ¶ 91.

113. The Consolidation Reports also included a graph captioned "YoY Picks vs. Fills," which showcased picks increasing substantially in 2021 and 2022 before suddenly dipping in 2023, while the fills continued to increase. *Id.* ¶ 92. A reproduction of the chart from the December 2023 report, as included in the Securities Class Action, is below, which also includes a 2024 internal estimate of picks and fills:




*Id.*

114. The Consolidation Reports also showcased a graph that showed that the Company's excess barrels had more than tripled between 2020 and 2023, growing from 59,867 in 2020 all the way to 188,047 in 2023. *Id.* ¶ 93. The chart also noted that the Company's fills exceeded picks by 113% in 2023. *Id.*

115. This logistical conundrum quickly morphed into a nightmare, as FE-1 recounted that the Company was so "***screwed on space***[]" that "***we were shoving barrels every place that we possibly could***," such that the Company's predicament became "***very ugly***" fast. *Id.* ¶ 62. In fact,

according to FE-1 the Company was "***. . . putting barrels where we should not have been putting them***," such as stacking the barrels into aisles and walkways, with FE-1 further noting that "***We were over capacity in our warehouses even from a safety standpoint***." *Id.* As a result of this increase in production coinciding with the decrease in demand, the average age of barrels in storage went from a range of 3-4 years up to 5-7 years. *Id.* ¶ 61.

116. Rather than properly address the Company's ballooning inventory levels, MGP management's choice of solution was to increase the Company's storage capacity notably in Williamstown, Kentucky. However, even this supposed solution fell through, as the Williamstown expansion lost considerable support from local officials on account of public safety concerns. FE-1 reported that "***[t]here was a lot of uproar over the whiskey fungus***." *Id.* ¶ 65. After the plan collapsed, FE-1 stated that the Company "***. . . went into full crisis mode, and we had to shove barrels wherever. I asked if they were going to slow down [production], and they adamantly said no***." *Id.*

117. FE-1 reported that MGP's inventory problems became so substantial that the Company was forced to engage third-parties to store 96,000 excess barrels of product, to the tune of roughly $5 million. *Id.* ¶ 66. Nevertheless, the Company persisted and by the time FE-1 left the Company in July 2024, MGP's inventory had skyrocketed to 3.6 million barrels, from between 1-2 million barrels in January 2023. *Id.* ¶ 67.

118. As the Company's Executive Vice President of Operations, FE-2 also observed unfortunate results of the Company continuing to fill barrels despite decreased demand. FE-2 stated that shortly after joining the Company in June 2024, he became aware that MGP's customer demand was declining substantially. *Id.* ¶ 73. FE-2 further stated that he found the fact that many

of the Company's contracts with customers were not being honored on account of this falling demand to be "***quite shocking***." *Id.*

119. FE-2 noted that the demand issues reached a point that the Company began to offer discounts and incentives to its customers, hoping to encourage that customers would take excess inventory that they had originally contracted for. *Id.* ¶ 78. The Company also began to aggressively pursue "spot" deals, which are limited purchases of inventory, typically offered at a discount, in order to properly make up for the slacking demand. *Id.* In essence, FE-2 noted how the Individual Defendants were "chasing their forecast." *Id.*

**False and Misleading Statements**

***May 4, 2023 Press Release and Earnings Call***

120. On May 4, 2023, the Company issued a press release announcing its financial results for the first quarter of the 2023 Fiscal Year ("the Q1 2023 Earnings Release"). The Q1 2023 Earnings Release was also filed as an attachment to a Form 8-K with the SEC, which was signed by Defendant Gall. The Q1 2023 Earnings Release revealed that the Company had surpassed its financial estimates for the first quarter of the 2023 Fiscal Year. More specifically, the Q1 2023 Earnings Release reported to investors that the Company had "***strong new distillate customer commitments, higher pricing across all brown goods, and stronger than expected customer demand for spot purchases.***"

121. That same day, the Company hosted the Q1 2023 Earnings Call with investors to discuss the Company's first quarter financial results. During his scripted remarks on the Q1 2023 Earnings Call, Defendant Colo emphasized the "***ongoing solid demand for our new distillate and aged whiskey***" and reported that "***demand for [MGPI's] products in each of our 3 segments remains strong . . . our business continues to be well positioned***." Later during the Q1 2023 Earnings Call, Defendant Colo further conveyed the distinction between MGP and its competitors

in noting the Company's "***significant share, scale advantage, and our aging whiskey inventory position***." Defendant Colo went on to explain that MGP had attained "***improvement in demand visibility and consistency***" specifically due to the Company's "***brown good sales growth continues to outpace longer-term market trends***."

122. Also during the Q1 2023 Earnings Call, analysts asked Defendant Colo to expand on his description of the Company's inventory levels, more specifically as to whether MGP "expect[ed] inventory levels to stay somewhat elevated in relation to sales as the year progresses" or whether inventory would "be worked down" to "be more in line with the sales growth at the end of the year." Defendant Colo responded by stating that "***we expect that inventory levels will pretty much – shipments should equal to [completions] is the ideal way the industry runs, and we anticipate that as the year plays out, that's where the inventories will kind of normalize too.***"

***May 9, 2023 Investor Presentation***

123. On May 9, 2023, the Company published an investor presentation which accompanied its Q1 2023 financial results (the "Q1 2023 Investor Presentation"). The Q1 2023 Investor Presentation represented that the Company's inventory levels were "***in balance***" at that time. More specifically, the Q1 2023 Investor Presentation featured a slide titled "Capital Allocation Priorities Remain Focused On Growth Opportunities," which made reference to the Company's "whiskey put-away." With respect to "whiskey put-away," the Company reported that "***[w]ith our inventory in balance***, matching put-away with growing future Distilling Solution sales . . . is a priority." The Q1 2023 Investor Presentation further conveyed to investors that MGP's Distilling Solutions segment was "***well positioned to continue benefiting from growth in U.S. Spirits – primarily American whiskey,***" and cited the Company's "***capacity and capability***

***provid[ed] [a] key competitive advantage***[]" as a point of differentiation with regard to industry competitors.

***August 3, 2023 Press Release and Earnings Call***

124. On August 3, 2023, the Company issued its Q2 2023 Earnings Release, which it also filed with the SEC as an attachment to a Form 8-K, which was signed by Defendant Gall. The Q2 2023 Earnings Release quoted Defendant Colo and the Company as touting that MGP's brown goods sales were "***driven by strong demand for our new distillate and aged whiskey.***"

125. Also on August 3, 2023, the Company hosted its Q2 2023 Earnings Call. During the Q2 2023 Earnings Call, Defendant Colo stated that "***demand for [MGP's] products in each of our 3 segments remains strong.***" Moreover, Defendant Colo continued to stress the differentiation between the Company and its competitors, stating that "***[o]ur significant market advantages continue to position us well to support continued growth in the American whiskey category,"*** and reiterated that MGP's "***brown good sales growth continues to outpace longer-term market trends.***"

126. Later during the Q2 2023 Earnings Call, Defendant Colo asserted that "***the majority of our expected Distilling Solutions segment brown goods sales for next year [are] already committed.***" Upon analysts' request for "more incremental color," Defendant Gall stated that "***as [Defendant Colo] shared earlier, the majority of our expected brown goods sales next year are committed at this point.***" Defendant Gall reported committed sales "***across all spectrums***" including "***new distillate and aged***," and highlighted that these commitments were "***representative of our whole customer set and portfolio.***"

***August 14, 2023 Investor Presentation***

127. On August 14, 2023 the Company issued an investor presentation concerning its second quarter 2023 financial results (the "Q2 2023 Investor Presentation"). The Q2 2023 Investor Presentation repeated statements from the Q1 2023 Investor Presentation identified and referenced in ¶ 123.

***November 2, 2023 Press Release and Earnings Call***

128. On November 2, 2023, the Company issued its Q3 2023 Earnings Release announcing its financial results for the third quarter of the 2023 Fiscal Year, which it also filed on Form 8-K with the SEC. The Q3 2023 Earnings Release highlighted the Company's sales in brown goods. Specifically, the Q3 2023 Earnings Release quoted Defendant Colo as stating the sales were "***driven by strong demand for our new distillate and aged whiskey.***"

129. That same day, the Company hosted its Q3 2023 Earnings Call. During his scripted remarks on the Q3 2023 Earnings Call, Defendant Colo emphasized the growth in sales of brown goods. Defendant Colo repeated his statement in the previous quarter that "***demand for [MGP's] products in each of our 3 segments remains strong***" and that "***brown good sales growth continues to outpace longer-term market trends.***"

130. Likewise, Defendant Gall conveyed to investors that "***demand for our brown goods from a volume standpoint remains intact.***"

131. Later in the Q3 2023 Earnings Call, Defendant Colo stated that "***our visibility is also improving***" due to the fact that the Company supposedly "***now [has] the vast majority of our expected Distilling Solutions segment brown good sales for 2024 already committed***."

132. Also during the Q3 2023 Earnings Call, analysts focused on "the comment" that "a vast majority of brown good sales for next year are already committed." Specifically, analysts sought further information as to how brown good sales were "tracking compared to this point last

year," the existence of "any underlying shift in mix of aged versus new," any "color on how [] negotiations have been progressing," and whether "pricing ability" remained "strong." Defendant Colo replied by stating that the Company was "on track," touting the "forward commitments in place" and the "***excellent progress on our aged brown good sales for 2024.***" Defendant Colo further boasted that "the team is already working on 2025 [sales] as well."

133. During the Q3 2023 Earnings Call, analysts also asked the Individual Defendants to touch on the "overall sluggish slowdown on spirits in general, about incremental demand for brown goods." Defendant Colo maintained the earlier claim that the Company was insulated from industry-wide demand shocks, citing MGP's exceptional "***position that we're in with having forward commitments on both new distillate and aged***"; "***Our customers continue to want to forward book commitments with us***"; and therefore "***the demand we're seeing remains pretty solid for the new distillate and aged***."

134. Moreover, during the Q3 2023 Earnings Call, analysts reported that they were "hearing anecdotally that the third-party whiskey pricing might be under pressure" and questioned whether the Company was "inventory building." In response, Defendant Colo denied the existence of any such problems with the Company's inventory. Specifically, Defendant Colo asserted that "***on our inventories . . . [MGP is] not seeing anything today that would tell us that we, as a company, are imbalanced in that particular regard***."

***November 7, 2023 Investor Presentation***

135. On November 7, 2023, the Company issued an investor presentation concerning its third quarter 2023 financial results (the "Q3 2023 Investor Presentation"). The Q3 2023 Investor Presentation repeated statements from the Q1 2023 Investor Presentation identified and referenced in ¶ 123.

136. The above statements in ¶¶120-135 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) despite their claims, the Individual Defendants did not have a good sense as the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; and (4) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**<u>The Truth Begins Emerging While False and Misleading Statements Continue</u>**

***February 22, 2024 Press Release, Earnings Call, and Annual Report***

137. On February 22, 2024, the Company issued a press release announcing its fourth quarter and year-end results for the 2023 Fiscal Year, which it later filed on Form 8-K with the SEC (the "FY 2023 Earnings Release"). The FY 2023 Earnings Release revealed that the Company's sales guidance for the 2024 Fiscal Year was expected to be millions less than the consensus estimate, coming in the range of $742 to $756 million. The FY 2023 Earnings Release further revealed that the Company's brown goods sales strategy would start to move away from aged spirits and towards new distillate spirits.

138. That same day, the Company hosted an earnings call with analysts and investors to discuss the year-end results (the "FY 2023 Earnings Call"). On the FY 2023 Earnings Call, Defendant Bratcher explained the disappointing guidance while confirming industry reports, stating that "inventory destocking at a wholesale level will remain an issue for the branded spirits industry in 2024." As such, Defendant Bratcher represented that "total aged whiskey revenues in 2024 [would] be less than 2023."

139. On this news, the price per share of MGP stock fell $13.65, or 14.9%, from closing at a price of $91.83 per share on February 21, 2024, to close at a price of $78.18 per share on February 22, 2024. However, the Individual Defendants continued to obfuscate the truth in its public statements pertaining to demand for the Company's product and its inventory levels, including in the above statements.

140. For example, in trying to downplay the negativity during the FY 2023 Earnings Call, Defendant Bratcher stated that MGP was seeing "***healthy demand for our products continue***," and the Company "***continued to experience healthy demand for new distillate and aged whiskey***." Defendant Bratcher went on to state that "***more than 90% of our new distillate whiskey sales volume is committed in 2024***," reinforcing his previous representations to investors that "***we do have the vast majority of our anticipated total brown goods volume committed for 2024***."

141. Also during the FY 2023 Earnings Call, Defendant Gall conveyed that both Defendant Bratcher and himself were observing the Company's inventory personally, stating that "we continue to monitor the potential impact of inventory levels of distributors" and that the Individual Defendants continued to monitor demand, both in terms of "overall American whiskey supply and consumption patterns" and the impact "on consumers." Defendant Gall asserted that the Company's positive trajectory would persist in spite of macroeconomic trends, stating that "***[d]espite these industry headwinds, we feel uniquely positioned to grow as a company in this dynamic operating environment***." Defendant Gall further stated that "we do not expect new distillate sales to decline year-over-year. In fact, ***we expect brown good sales in total to continue to grow in line with or better than the broader category of American Whiskey in 2024.***"

142. Also on February 22, 2024, the Company filed its Annual Report on a Form 10-K with the SEC to report its financial results for the 2023 Fiscal Year (the "2023 10-K"), which was signed by Defendants Gall, Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak, and included attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Bratcher and Gall attesting to the accuracy of the 2023 10-K.

143. The 2023 10-K featured supposed "risk factors" concerning MGP's "changes in customer preferences and purchases." The aforementioned risk factor stated that "***[i]f our customers and consumers shift away from spirits (particularly brown spirits, such as our bourbon, rye, and other whiskeys) . . . our business, financial condition, or results of operations could be adversely affected***." Additionally, the 2023 10-K provided another "risk factor" with regard to profitability and aged distillate, stating that "***inaccurate decisions or estimations could lead to . . . a future surplus of inventory***."

***February 26, 2024 Investor Presentation***

144. On February 26, 2024, the Company issued an investor presentation concerning its FY 2023 financial results (the "FY 2023 Investor Presentation"). The FY 2023 Investor Presentation repeated statements from the Q1 2023 Investor Presentation identified and referenced in ¶ 123.

***2024 Proxy Statement***

145. On April 9, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak solicited the 2024 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

146. The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) re-elect Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak to the Board; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal year; (3) approve, on an advisory basis, the compensation of the Company's named executive officers; and (4) approve the 2024 Incentive Plan.

147. The 2024 Proxy Statement noted that if the MGP shareholders approved the 2024 Incentive Plan, it would become effective immediately, as the pre-existing 2014 plans had otherwise expired on April 1, 2024. Further, the 2024 Proxy Statement noted that approval of the 2024 Incentive Plan will cause 1,320,000 shares to be made available under the 2024 Incentive Plan for issuance. Additionally, the 2024 Incentive Plan makes clear that employees and non-employee directors alike are eligible to receive compensation under the plan, and that there is no separate non-employee director incentive plan.

148. Regarding the "Board Role in Risk Oversight," the 2024 Proxy Statement stated the following, in relevant part:

> Our Board as a whole has ultimate responsibility for risk oversight. It exercises this oversight function through its standing committees, each of which has primary risk oversight accountability for matters relating to their respective area of responsibility, as detailed below. The independent structure of our Board and Board committees allows for objective risk oversight.
>
> - Audit Committee: Oversees the integrity of our financial statement and financial reporting process, risks related to our financial reporting practices and internal controls, and our enterprise risk management ("ERM") process, which includes cybersecurity risks.
>
>   As part of our ERM process, management regularly identifies, evaluates, and prioritizes potential risks and creates a risk register of these risks. Our executive management team and business unit leaders decide on actions and strategies to use to mitigate our risks based on this risk register. Our ERM

process and risk register were reviewed with the Audit Committee, along with our strategies for managing our risks, at three meetings during 2023.

- Human Resources and Compensation Committee: Oversees risks related to our compensation policies and practices as well as human capital management.

- Nominating and Corporate Governance Committee: Oversees risks related to our corporate governance, governance structure, Board composition, Board independence, as well as environmental, social, and governance ("ESG") matters, except those matters overseen by another Board committee (such as human capital management).

149. Regarding the Code of Conduct, the 2024 Proxy Statement stated the following:

> Our Board has adopted Corporate Governance Guidelines, which are available on the Governance page of the Investor Relations section of our website at ir.mgpingredients.com/corporate-governance/governance-documents, along with our Board committee charters and Code of Conduct.

150. Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) despite their claims, the Individual Defendants did not have a good sense as the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

151. The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced

by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

152. As a result of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak to the Board, thereby allowing them to continue to breach their fiduciary duties to the Company; (2) ratify the selection of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; (3) approve named executive officer compensation on an advisory, non-binding basis; and (4) approve the 2024 Incentive Plan.

153. As a result of the shareholders approving the 2024 Incentive Plan, the plan took effect immediately after receiving shareholder approval. Additionally, there were 1,320,000 shares available for issuance under the 2024 Incentive Plan. The Individual Defendants, including many of whom are current directors of the Company, received material personal benefits that they otherwise would not have received but for the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Incentive Plan. Moreover, certain of the Individual Defendants continue to receive material personal benefits in the form of stock awards and will continue to receive material personal benefits in the form of stock awards pursuant to the 2024 Incentive Plan in the future.

***May 2, 2024 Earnings Call***

154. On May 2, 2024, the Company hosted an earnings call with investors and analysts to discuss the Company's financial results for the first quarter of the 2024 Fiscal Year (the "Q1 2024 Earnings Call"). On the Q1 2024 Earnings Call, Defendant Bratcher asserted that MGP was immune from the inventory and demand shocks affecting the alcohol industry, stating that "***[d]emand for our products in each of the 3 segments remain strong***."

155. During his own statements on the Q1 2024 Earnings Call, Defendant Gall stated that "***despite***" "***the potential impact of inventory levels at distributors, overall American whiskey supple and consumption patterns, and inflation on consumers***," the Company was "***uniquely positioned to grow as a company in this dynamic operating environment***."

156. Also during the Q1 2024 Earnings Call, analysts asked whether the Individual Defendants continued to anticipate "brown goods to outpace category growth[,]" and inquired as to whether there had "been any change of tone from your customers regarding the demand." Defendant Gall replied that "***[w]e do continue to expect brown goods to grow over the course of the year. And as far as tone underlying from our customers, as we reiterated, we saw the vast majority of our sales committed. We're working very closely with our customers to make sure that we can execute and produce as they need it***."

157. Also during the Q1 2024 Earnings Call, Defendant Bratcher reinforced Defendant Gall's statements, stating "***we have really good visibility into the rest of the year because of the strategy that we put in place***" and "***we haven't heard or seen or felt anything that's any different than what we previously stated***." Moreover, Defendant Bratcher bragged about the "***success we've had in obtaining new distillate commitments***."

158. During the question-and-answer portion of the Q1 2024 Earnings Call, analysts inquired as to where the Company's "inventory levels sit," and whether the Individual Defendants

saw "pressure," particularly with regard to the Branded Spirit business. Not only did Defendant Bratcher fail to disclose the substantial inventory issues the Company was experiencing, but he went as far as to state that the Company's "business [was] ***stabilized***," and that "[w]e've worked really hard with our distributors and ***understating the inventory levels and managing those levels within to meet customer demand. So destocking for us at a distributor level is not a core [issue]***." Defendant Bratcher further conveyed to investors that MGP had "been able to . . . ***get [] inventory manage[d] to the right level[]"*** within the Branded Spirits business but nevertheless ignore the major inventory problems gripping the Company's Distilling Solutions segment.

***May 14, 2024 Investor Presentation***

159. On May 14, 2024, the Company issued an investor presentation concerning its Q1 2024 financial results (the "Q1 2024 Investor Presentation"). The Q1 2024 Investor Presentation repeated statements from the Q1 2024 Investor Presentation identified and referenced in ¶ 123.

***August 1, 2024 Earnings Call***

160. On August 1, 2024, the Company hosted its Q2 2024 Earnings Call to discuss the financial results for the second quarter of the 2024 Fiscal Year.

161. On the Q2 2024 Earnings Call, Defendant Bratcher discussed how the Company remained immune from industry-wide inventory issues. In response to an analyst's question as to whether "inventory destock" was occurring at the MPG, Defendant Bratcher first acknowledged that "other people [were] talk[ing] about the consistency of the inventory," but explained that MGP as a Company remained distinguished from its competitors because "***our inventory is exactly where we need -- it has been exactly where we needed it***. And we continue to monitor it on a daily basis."

162. Also during the Q2 2024 Earnings Call, Defendants Bratcher and Gall reasserted the Company's guidance, and flaunted MGP's "***continued momentum***" in "***solid brown goods sales***[.]" Defendant Gall further bragged that "***we continue to have good visibility for our second half brown goods sales, with committed contracts for a vast majority of expected volumes***."

163. Later during the Q2 2024 Earnings Call, an analyst from Truist conveyed "***concern that we're seeing a pause in spirits consumption and obviously, some of the bigger global players have been more cautious***," and sought a response from the Individual Defendants. Defendant Bratcher replied that all problems would be solved with the Company's sales strategy shift towards new distillate, stating "as we've talked about multiple times, the advantage of the new distillate is there is a contract basis. We're hearing the same things that you would hear, as you would hear on other investor calls, but I can ***-- as we said multiple times. . .The great thing about that business, as we've always said, is that it's contracted. . . . we're very happy with our strategy on new distillate because of that***."

164. The above statements in ¶¶140-144; 154-163 were materially false and misleading because they failed to disclose, *inter alia*, that: (1) despite their claims, the Individual Defendants did not have a good sense of the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Fully Emerges**

***October 17, 2024 Press Release***

165. The truth began to fully emerge on October 17, 2024, when the Company issued the Q3 2024 Preliminary Earnings Release, which it also filed as an attachment to a Form 8-K filed with the SEC. The Q3 2024 Preliminary Earnings Release revealed that the Company anticipated third quarter sales that were ***24%*** lower than the same period in the prior year. Notably, the Q3 2024 Preliminary Earnings Report reported sales in the Distilling Solutions segment expected to decline by ***36%***, largely driven by a ***22% decline in brown goods sales***. As such, the Q3 2024 Preliminary Earnings Release further revealed the Company was forced to negatively update its guidance, with anticipated sales in the range of $695 to $705 million (as opposed to the previous guidance of $742 to $756 million). The Company also conceded that "***elevated industry-wide whiskey inventories [were] putting greater than expected pressure on [MGP's] brown goods business***."

166. On this news, the price per share of MGP stock fell $24.07 over the course of three trading days, or 29.5%, from closing at a price of $81.57 per share on October 17, 2024, to close at a price of $57.50 per share on October 22, 2024. This decline in stock price equated to a market capitalization decline of over $500 million.

***October 31, 2024 Press Release, Investor Presentation, and Earnings Call***

167. The truth fully emerged on October 31, 2024, when the Company issued the Q3 2024 Earnings Release. The Q3 2024 Earnings Release revealed that the Company's third quarter financial results for 2024 "***materially missed***" prior expectations. The Q3 2024 Earnings Release admitted that excess inventories had an "***even greater impact***" on sales which forced the Company to reduce the scale of its operations. In the Q3 2024 Earnings Release, Defendant Bratcher stated,

"[i]n response to the softening American whiskey category trends and elevated industry-wide barrel inventories, in 2025 we plan to further lower our net aging whiskey put away, scale down our whiskey production, and optimize our cost structure to mitigate lower production volumes."

168. The Company's investor presentation, also published on October 31, 2024 (the "Q3 2024 Investor Presentation"), reported the "WEAK QUARTERLY PERFORMANCE DRIVEN PRIMARILY BY BROWN GOODS" and "LOWER PROFITABILITY PRIMARILY DUE TO BROWN GOODS DECLINE." (Emphasis in original).

169. That same day, the Company hosted the Q3 2024 Earnings Call with investors. On the Q3 2024 Earnings Call, the Individual Defendants finally conceded that they anticipated "lower aged and new distillate sales" to drive "***a nearly 35% decline in Distilling Solutions segment sales and a nearly 50% decline in Distilling Solutions segment gross profits in 2025***." Defendant Bratcher admitted that the Company was negatively impacted by "***slower retail sales and ongoing destocking at a wholesale and retail level,***" ***and that*** "***higher inventories are leading to lower demand, lower prices and reduced visibility on our contract distilling sales***."

170. Defendant Gall then added that as a result, the Company would be "significantly reducing our brown goods production to better align with demand in 2025," and added that "softer American whiskey growth and elevated barrel inventories continue to constrain demand for aged whiskey and increasingly our new distillate."

171. Also during the Q3 2024 Earnings Call, the Individual Defendants finally acknowledged that "***customers were having difficulties in meeting their contractual obligations to purchase whiskey***," and consequently that "***our aged and our spot business is stalled***." Defendant Bratcher further elaborated that "***elevated industry-wide barrel whiskey inventories***"

were having an "impact" on "not only [MGPI's] aged whiskey spot sales, ***but also on our new distillate volumes***."

172. Analysts pulled no punches during the question-and-answer portion of the Q3 2024 Earnings Call, with one Truist Securities analyst going so far as to tell the Individual Defendants that "we've seen a ***slowdown in American whiskey consumption now for 12, almost 18 months***," and that the "***surprise factor is that you're just realizing it, seeing it now***."

173. On this news, the price per share of MGP stock fell $8.27, or 14.7%, from closing at a price of $56.31 per share on October 30, 2024, to close at a price of $48.04 per share on October 31, 2024. Additionally, MGP's share price continued to decline the next trading day by $2.52, or roughly 5%, to close at $45.52 on November 1, 2024.

## SUBSEQUENT DEVELOPMENTS

174. On December 20, 2024, the Company announced in a Form 8-K filed with the SEC that Defendant Bratcher was departing from his role as CEO and as a director on at the close of business on December 31, 2024 "under circumstances entitling him to severance benefits under his employment agreement."

175. The Form 8-K also announced that Defendant Gall would take over as interim-CEO effective January 1, 2025, as the Company searched for a replacement for Defendant Bratcher.

176. At the 2025 Annual Meeting of Shareholders held on May 20, 2025, the Company nominated and elected Jennifer Lowry to serve as a Company director.

## REPURCHASES DURING THE RELEVANT PERIOD

177. During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $10 million to repurchase approximately

128,360 shares of its own common stock at artificially inflated prices from March 2024 through July 2024.

178. According to the Form 10-Q the Company filed with the SEC on May 2, 2024 for the quarterly period ended March 31, 2024 (the "Q1 2024 10-Q"), between March 1, 2024 and March 31, 2024, the Company repurchased 59,084 shares of its own common stock at an average price per share of approximately $84.62, for a total cost to the Company of approximately $4,999,688.

179. As the Company's stock was actually worth only $49.04, the price at closing on October 31, 2024, the Company overpaid by approximately $2,102,209 for repurchases of its own tock between March 1, 2024 and March 31, 2024.

180. According to the Form 10-Q the Company filed with the SEC on August 1, 2024 for the quarterly period ended June 30, 2024 (the "Q2 2024 10-Q"), between May 1, 2024 and May 31, 2024, the Company repurchased 33,363 shares of its own common stock at an average price per share of approximately $74.93, for a total cost to the Company of approximately $2,499,890.

181. As the Company's stock was actually worth only $49.04, the price at closing on October 31, 2024, the Company overpaid by approximately $863,768 for repurchases of its own tock between May 1, 2024 and May 31, 2024.

182. According to the Form 10-Q the Company filed with the SEC on October 31, 2024 for the quarterly period ended September 30, 2024 (the "Q3 2024 10-Q"), between July 1, 2024 and July 31, 2024, the Company repurchased 35,913 shares of its own common stock at an average price per share of approximately $69.61, for a total cost to the Company of approximately $2,499,904.

183. As the Company's stock was actually worth only $49.04, the price at closing on October 31, 2024, the Company overpaid by approximately $738,730 for repurchases of its own tock between July 1, 2024 and July 31, 2024.

184. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $3.7 million.

## INDIVIDUAL DEFENDANTS' KNOWLEDGE

185. Throughout the Relevant Period, the Individual Defendants had access to internal metrics regarding the Company's inventory levels and demand for the Company's products. In addition, the Individual Defendants were both in consistent contact with employees who were aware of the true nature of the Company's demand and inventory issues, and received consistent feedback from such employees regarding the Company's stated issues.

### *The Company's Former Employees Testified in the Securities Class Action About the Individual Defendants' Knowledge*

186. In his capacity as a Warehouse Logistics and Quality Manager, FE-1 stated that he engaged in weekly calls each Wednesday to discuss the Company's inventory levels with MGP's senior executives, notably Defendants Bratcher and Gall. SAC ¶ 56. FE-1 noted that as the Relevant Period persisted, the Individual Defendants increased the frequency of such calls to a daily basis.

187. Following the completion of the continuously-operating still, FE-1 reported that the Company "***. . . turned that bad boy on and were running it full bore***." This conduct had the predictable result which FE-1 noted: "***[w]e were filling like gangbusters, and I kept telling management that we were running out of space***." *Id.* ¶ 58.

188. Notably, FE-1 discussed the Company's demand and inventory issues stated above on calls and in meetings with Chief Commercial Officer Pasagic, Defendant Bratcher, and other

members of the Company's senior management. *Id.* ¶ 60. FE-1 recounted how the reports he reviewed throughout these calls and meetings revealed that the MGP's inventory buildups showed "***it was tumultuous and [MGPI] continued pumping barrels, and they said it was my problem***" to properly store the barrels. *Id.* As such, according to FE-1 the Company was "***chasing orders***" at the end of each month and quarter. *Id.* FE-1 further conveyed that in spite of the apparent excess inventory issues the Company faced, MGP management "***were hammering on to fill, fill, fill. We are not slowing down***." *Id.*

189. When asked about the February 2024 statements concerning the stabilization of inventory levels and MGP's "unique" position for growth in the industry, FE-1 stated that the Individual Defendants were indeed aware of the Company's problems but represented the opposite to investors. *Id.* ¶ 68. As FE-1 stated, "***[t]hat was one of the reasons why I left the Company***[,]" as "[b]etween the lack of investment in automation and the sustainability from an inventory model it was going to bust, and ***I was not about to be the fall guy. You could see the freight train coming and I decided to get off of the tracks***." *Id.*

190. With regard to personal profit on behalf of the Individual Defendants, FE-1 reported that he believed the Individual Defendants to have engaged and maintained the inventory pumping scheme to preserve their lucrative bonuses. *Id.* ¶ 69. FE-1 also stated that he had never experienced such a bonus in his employment with the Company. *Id.* Moreover, FE-1 asserted that "***the executive team was well aware of the situation that we had. I reported every month on the issues***[,]" and that "***[e]very week [he] was either speaking to [Defendant] Bratcher directly or reporting up . . .***" *Id.* ¶ 70. Thus, according to FE-1, MGP's upper management notably Defendants Bratcher and Gall "***knew every step of the way***." *Id.* ¶ 71.

191. Likewise, FE-2, in his role as the Company's Executive Vice President of Operations, noted through conversations he heard within the Company that the Individual Defendants understood MGP was experiencing the same demand and inventory shocks that its competitors faced. More specifically, FE-2 stated that "***[e]verything that I heard in the office was that inventory was bloated across the entire [consumer products goods] category and all the other big players were in a similar situation***." *Id.* ¶ 74. In spite of such acknowledgments, according to FE-2 MGP executives maintained the position that "***We were not slowing down production and the customers were not taking the volume. That was my first red flag of where is the volume?***" *Id.*

192. FE-2 went on to describe Defendant Bratcher's personal involvement, but first described Defendant Bratcher as someone with an "***ego the size of Kansas***." *Id.* ¶ 75. As such, FE-2 reported that as "***I was trying to get us to slow down . . . [but Defendant] Bratcher refused to slow down, being very bullish . . .***" *Id.* ¶ 76. Moreover, upon further examination FE-2 determined that the Company's contracts were "***garbage***," and added that "***[i]t was a red flag when your sales team cannot tell you why their customer is not taking the volume***." *Id.* ¶ 77.

193. FE-2 further explained that MGP management, including the Individual Defendants, were well aware of the Company's inventory problems long before October 2024. *Id.* ¶ 80. FE-2 stated that the Company's management were discussing volume problems from "day one when I walked into the building." *Id.* In the words of FE-2, even though the Company disclosed the existence of such issues in October 2024 "***[t]hat was when they declared they knew about the volumes, but we knew from day one when I joined the Company***." *Id.*

194. FE-3, who formerly served as a Director of Sales Operations for the Distilling Solutions segment, reinforced many of the sentiments raised by FE-1 and FE-2. Most notably, FE-

3 reported that the Company's internal demand and sales forecasts were in direct opposition to the public statements during the Relevant Period. In the words of FE-3, any employee "who had access to a computer" could see MGP's internal forecasting through the Company's "Whiteboard" system. *Id.* ¶ 83. Further, this Whiteboard system possessed a function which allowed employees to compare internal forecasting with actual sales. *Id.*

195. FE-3 also stated that he attended weekly meetings with Defendant Bratcher and other MGP executives to discuss the variances between internal forecasts and actual sales. *Id.* FE-3 reported that Defendant Bratcher actively participated in such meetings. *Id.*

196. FE-4, formerly a Customer Service Specialist with the Company Distilling Solutions segment, further reinforced the observations made by FE-1, FE-2, and FE-3. FE-4 stated that throughout the Relevant Period, the Company was hemorrhaging both large and small customers in the distilled whiskey business. *Id.* ¶ 84. This was largely due to the fact that in the words of FE-4, the American whiskey market was "***saturated***." *Id.*

197. Moreover, FE-4 recounted that statements made in February 2024 were false and inaccurate. *Id.* ¶ 85. More specifically, FE-4 asserted the statements that "resilient growth in the American whiskey industry" and "while U.S. premiumization trends slowed broadly in 2023, we are encouraged by the continued growth in the American whiskey category[]" were false. *Id.*

***Internal Company Documents Shown to the Individual Defendants Show Their Knowledge of the Company's Inventory Issues***

198. Throughout the Relevant Period, the Individual Defendants had access to internal metrics regarding the Company's customer demand and inventory levels. More specifically, the Individual Defendants possessed access to Excel spreadsheets detailing the "fill" figures (*i.e.*, the amount of barrels filled with Company product) and the "pick" figures (*i.e.* the amount of barrels shipped to customers). *Id.* ¶ 87. Moreover, these spreadsheets were updated on a daily, weekly,

and monthly basis. Notably, these internal metrics revealed that during the first eleven months of 2023, the Company filled more than double the amount of barrels actually shipped to customers thus adding ***over 173,000 barrels to the Company's inventory.*** *Id.* ¶ 89. The internal Company documents and associated metrics referenced above demonstrate that the Individual Defendants were continually updated and aware of the Company's ballooning inventory and demand issues.

199. In addition, the Consolidation Reports were provided to the Company's executives in November and December 2023. The Consolidation Reports contained multiple slides which detailed the Company's pick rates, how the Company's fill rates were outpacing the Company's fill rates on a yearly basis, and the amount of excess barrels in the Company's inventory. *Id.* ¶¶ 90-94.

200. The Consolidation Report further included "Exercise Objectives" that noted the disparity between the Company's pick and fill rates, and the subsequent bloated inventory. *Id.* ¶ 95. Notably, an "Exercise Objective" for the Company's warehousing team was "[a]lignment between fill rates and anticipated storage capacity limits." *Id.* The November 2023 Consolidation Report even noted that the Company's warehouse space would be depleted by June 2024, stating "Doing nothing to working capacity and based upon current fill rate trends we would have been out of space [in the] Jun/July 2024 Timeframe." *Id.* ¶ 96. The November 2023 Consolidation Report even noted that if the Company exercised "aisle usage & additional rows, lot consolidations, [and] [u]se of E-sub basement" as a means of increasing capacity (which it did), then it would only buy the Company a couple of extra months of inventory, stating that "[w]ith the added capacity we are looking at Sep/Oct 2024 to be out of space." *Id.* ¶ 97.

## DAMAGES TO MGP

201. As a direct and proximate result of the Individual Defendants' conduct, MGP will lose and expend many millions of dollars.

202. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

203. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

204. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

205. Such losses include the Company's overpayment of approximately $3.7 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above.

206. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

207. As a direct and proximate result of the Individual Defendants' conduct, MGP has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

208. Plaintiffs bring this action derivatively and for the benefit of MGP to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of MGP, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, for violations of the Exchange Act.

209. MGP is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

210. Plaintiffs are, and have been at all relevant times, shareholders of MGP. Plaintiffs will adequately and fairly represent the interests of MGP in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

211. Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

212. A pre-suit demand on the Board of MGP is futile and, therefore, excused. At the time of filing of this amended consolidated complaint, the Board consists of the following nine individuals: Defendants Gerke, Lux, Mingus, Rauckman, Seaberg, and Siwak (the "Current Director-Defendants"), and non-parties Gerardo I. Lopez, Martin Roper, and Jennifer Lowry (collectively with the Current Director-Defendants, the "Current Directors"). Plaintiffs need only to allege demand futility as to five of the nine Current Directors that were on the Board at the time of the filing of this amended consolidated complaint.

213. Demand is excused as to all of the Current Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in to knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. This renders the Current Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

214. In complete abdication of their fiduciary duties, the Current Director-Defendants either knowingly or recklessly caused or permitted MGP to issue materially false and misleading statements. Specifically, the Current Director-Defendants caused MGP to issue false and misleading statements which were intended to make MGP appear more profitable and attractive to investors. Moreover, the Current Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Current Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

215. To date, Defendants, Lux, Mingus, and Seaberg have received material personal benefits from their insider sales as a result of the Individual Defendants' false and misleading statements alleged herein. As a result of the false and misleading statements, Defendant Lux profited by approximately $6.5 million during the Relevant Period, Defendant Mingus profited by approximately $1.7 million during the Relevant Period, and Defendant Seaberg profited by approximately $6 million during the Relevant Period.

216. Additional reasons that demand on Defendant Gerke is futile follow. Defendant Gerke has served as a Company director since June 2021. He also serves as the Chair of the

Compensation Committee and as a member of the Audit Committee and the Nominating and Governance Committee. Defendant Gerke has received, and continues to receive, compensation for his role as a director. Defendant Gerke also signed the false and misleading 2023 10-K. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Lux, Michelson, Mingus, Rauckman, Seaberg, Siwak, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Gerke is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Gerke breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

217. Additional reasons that demand on Defendant Lux is futile follow. Defendant Lux has served as a Company director since June 2021, and as the Board Chairman since January 2024. Defendant Lux served as President and CEO of Luxco, which the Company merged with in April 2021, from 1991 until March 2021, and as Chairman of Luxco from 2010 until March 2021. Thus, as the Company admits, Defendant Lux is not independent. Defendant Lux has received, and continues to receive, compensation for his role as a director. Defendant Lux also signed the false and misleading 2023 10-K. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark,

Gerke, Michelson, Mingus, Rauckman, Seaberg, Siwak, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Lux is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Lux breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

218. Additional reasons that demand on Defendant Mingus is futile follow. Defendant Mingus has served as a Company director since June 2020. She also serves as a member of the Compensation Committee and the Nominating and Governance Committee. Defendant Mingus has received, and continues to receive, compensation for her role as a director. Defendant Mingus also signed the false and misleading 2023 10-K. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Rauckman, Seaberg, Siwak, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. Defendant Mingus is also beholden to Defendant Seaberg, her mother. As such, Defendant Mingus cannot disinterestedly consider a demand to sue the directors, which include her mother. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting

and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Mingus is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Mingus breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

219. Additional reasons that demand on Defendant Rauckman is futile follow. Defendant Rauckman has served as a Company director since June 2021. He also serves as the Chair of the Nominating and Governance Committee and as a member of the Audit Committee and Compensation Committee. Defendant Rauckman has received, and continues to receive, compensation for his role as a director. Defendant Rauckman also signed the false and misleading 2023 10-K. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Seaberg, Siwak, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Rauckman is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Rauckman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

220. Additional reasons that demand on Defendant Seaberg is futile follow. Defendant Seaberg has served as a Company director since August 2009. She also previously served as the Board Chairperson from December 2014-December 2024. In addition, Defendant Seaberg serves as a member of the Compensation Committee and the Nominating and Governance Committee. Defendant Seaberg has received, and continues to receive, compensation for her role as a director. Defendant Seaberg also signed the false and misleading 2023 10-K. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Siwak, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. Defendant Seaberg is beholden to Defendant Mingus, her daughter. As such, Defendant Seaberg cannot disinterestedly consider a demand to sue the directors, which include her daughter. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Seaberg is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Seaberg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

221. Additional reasons that demand on Defendant Siwak is futile follow. Defendant Siwak has served as a Company director since May 2022. He also serves as a member of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee.

Defendant Siwak has received, and continues to receive, compensation for his role as a director. Defendant Siwak also signed the false and misleading 2023 10-K. Furthermore, he solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and himself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Siwak is eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan. For these reasons, Defendant Siwak breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

222. In the event the Court determines that demand futility should be analyzed with respect to the membership of the Company's Board on January 23, 2025 (the "Initial Board"), the date that the first of the pre-consolidation cases were initiated, demand would nonetheless be excused as futile.[5]

223. A pre-suit demand on the Initial Board is futile and, therefore, excused. At the time of filing on January 23, 2025, the Initial Board consisted of the following eight individuals: Defendants Clark, Michelson, and the Current Director-Defendants (collectively, the "Director-

[5] Demand futility is examined with respect to the membership of the Board at the time the amended consolidated complaint is filed unless the asserted terms are "validly in litigation" at the time of the original complaint. *Braddock v Zimmerman*, 906 A.2d 776, 778-79 (Del. 2006).

Defendants"). Plaintiffs need only to allege demand futility as to four of the eight Director-Defendants that were on the Initial Board.

224. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to make false and misleading statements and omissions of material fact, which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

225. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

226. Additional reasons that demand on Defendant Clark is futile follow. Defendant Clark served as a Company director from June 2021 to May 2025. She also served as the Chair of the Audit Committee and as a member of the Compensation Committee and the Nominating and Governance Committee during the Relevant Period. Defendant Clark received compensation for her role as a director. Defendant Clark also signed the false and misleading 2023 10-K. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, Siwak, and herself to the Board, which allowed them to continue to

breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Clark was eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan at the time of its adoption. For these reasons, Defendant Clark breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

227. Additional reasons that demand on Defendant Michelson is futile follow. Defendant Michelson served as a Company director from May 2022 to April 2025. She also served as a member of the Audit Committee, the Compensation Committee, and the Nominating and Governance Committee during the Relevant Period. Defendant Michelson received compensation for her role as a director. Defendant Michelson also signed the false and misleading 2023 10-K. Furthermore, she solicited the 2024 Proxy Statement, which contained false and misleading statements and contributed to the re-election of Defendants Bratcher, Clark, Gerke, Lux, Mingus, Rauckman, Seaberg, Siwak, and herself to the Board, which allowed them to continue to breach their fiduciary duties to the Company and caused shareholders to approve the 2024 Incentive Plan. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, under the 2024 Incentive Plan, Defendant Michelson was

eligible to receive stock awards under the 2024 Incentive Plan, thereby materially benefiting from the adoption of the 2024 Incentive Plan at the time of its adoption. For these reasons, Defendant Michelson breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

228. Additional reasons that demand on the Board is futile follow.

229. The Director-Defendants solicited the 2024 Proxy Statement to call for a shareholder vote to, *inter alia*, re-elect themselves to the Board, thus allowing them to continue breaching their fiduciary duties to MGP.

230. In addition, the Director-Defendants caused the 2024 Proxy Statement to call for a shareholder vote to approve the 2024 Incentive Plan, which took the place of the previously existing plans as they expired on April 1, 2024. The misrepresentations and omissions set forth herein were material to shareholders in voting to approve the 2024 Incentive Plan who would not have approved the 2024 Incentive Plan, had they been informed about the Individual Defendants' misconduct. Before the shareholders approved the 2024 Incentive Plan at the annual meeting of stockholders of MGP on May 23, 2024, the previously existing plans had expired on April 1, 2024. For this reason, the Individual Defendants, including the Director-Defendants, received material personal benefits that they otherwise would not receive but for from the issuance of the false and misleading 2024 Proxy Statement and the shareholders approving the 2024 Incentive Plan that made 1,320,000 shares available under the 2024 Incentive Plan. As such, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

231. Demand in this case is further excused because the Class A directors, comprised of Defendants Gerke, Rauckman, and Siwak, are beholden to and controlled by Defendant Lux, who is the common stock controlling shareholder. Defendant Lux controls the Class A directors'

continued nomination to the Board. In light of this control, Defendants Gerke, Rauckman, and Siwak cannot impartially consider a demand against Defendant Lux, as they are dependent on him for their continued positions with the Company and the compensation that goes with that. Thus, Defendants Gerke, Rauckman, and Siwak are unable to evaluate a demand with disinterest or independence given Defendant Lux's control over them.

232. Demand in this case is further excused because the Class B directors, comprised of Defendants Clark, Michelson, and Mingus, are beholden to and controlled by Defendant Seaberg, who is the preferred stock controlling shareholder. Defendant Seaberg controls the Class B directors' continued nomination to the Board. In light of this control, Defendants Clark, Michelson, and Mingus cannot impartially consider a demand against Defendant Seaberg, as they are dependent on her for their continued positions with the Company and the compensation that goes with that. Thus, Defendants Clark, Michelson, and Mingus are unable to evaluate a demand with disinterest or independence given Defendant Seaberg's control over them.

233. Defendants Clark (as Chair), Gerke, Michelson, and Rauckman served as members of the Audit Committee during the Relevant Period (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over

financial reporting, disclosure controls and procedures, and the Business Standards. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

234. In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, the aiding and abetting thereof, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations, and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

235. MGP has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for MGP any part of the damages MGP suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

236. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability,

they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

237. The acts complained of herein constitute violations of fiduciary duties owed by MGP's controlling shareholders, officers, and directors, and these acts are incapable of ratification.

238. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of MGP. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of MGP, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

239. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause MGP to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

240. Thus, for all of the reasons set forth above, all of the Current Director-Defendants, and, if not all of them, at least five of the Current Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

241. Similarly, for all of the reasons set forth above and if the Court so chooses, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
## Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

242. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

243. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that:

> It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

244. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

245. Under the direction and watch of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak, the 2024 Proxy Statement failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct,

the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

246. The 2024 Proxy Statement also failed to disclose that: (1) despite their claims, the Individual Defendants did not have a good sense as to the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Incentive Plan; and (5) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

247. In the exercise of reasonable care, Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak to the Board and the approval of the 2024 Incentive Plan.

248. The false and misleading elements of the 2024 Proxy Statement led to, among other things, shareholders voting for: (1) the re-election of Defendants Bratcher, Clark, Gerke, Lux, Michelson, Mingus, Rauckman, Seaberg, and Siwak to the Board, which allowed them to continue to breach their fiduciary duties to the Company; and (2) the approval of the 2024 Incentive Plan.

249. The Company was damaged as a result of Defendants Bratcher's, Clark's, Gerke's, Lux's, Michelson's, Mingus's, Rauckman's, Seaberg's, and Siwak's material misrepresentations and omissions in the 2024 Proxy Statement.

250. Plaintiffs, on behalf of MGP, have no adequate remedy at law.

## SECOND CLAIM

## Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

251. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

252. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding MGP. Not only is MGP now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon MGP by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase 128,360 of its own shares at artificially inflated prices, damaging MGP.

253. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify

the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

254. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about MGP not misleading.

255. The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

256. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

**THIRD CLAIM**

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

257. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

258. The Individual Defendants, by virtue of their positions with MGP and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of MGP and each of its officers and directors who made the false and misleading statements alleged herein within the

meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause MGP to engage in the illegal conduct and practices complained of herein.

259. Plaintiffs, on behalf of MGP, have no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

260. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

261. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of MGP's business and affairs.

262. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

263. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of MGP.

264. In breach of their fiduciary duties owed to MGP, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) despite their claims, the Individual Defendants did not have a good sense as to the decreasing demand in the industry; (2) as a result of the foregoing, the Company failed to adjust its production and inventory levels accordingly; (3) because of this, the Company's inventory levels remained unsustainably high while demand for its products decreased; (4) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the 2024 Incentive

Plan; and (5) the Company failed to maintain internal controls. As a result, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

265. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

266. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

267. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed, while five of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $14.5 million.

268. The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of MGP's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

269. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

270. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MGP has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

271. Plaintiffs, on behalf of MGP, have no adequate remedy at law.

## FIFTH CLAIM
## Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duties

272. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

273. By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

274. Plaintiffs, on behalf of MGP, have no adequate remedy at law.

## SIXTH CLAIM
## Against the Individual Defendants for Unjust Enrichment

275. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

276. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MGP.

277. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from MGP that was tied to the

performance or artificially inflated valuation of MGP or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

278. Plaintiffs, as shareholders and representatives of MGP, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

279. Plaintiffs, on behalf of MGP, have no adequate remedy at law.

**SEVENTH CLAIM**
**Against the Individual Defendants for Abuse of Control**

280. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

281. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MGP, for which they are legally responsible.

282. As a direct and proximate result of the Individual Defendants' abuse of control, MGP has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, MGP has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

283. Plaintiffs, on behalf of MGP, have no adequate remedy at law.

**EIGHTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

284. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

285. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MGP in a manner consistent with the operations of a publicly held corporation.

286. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, MGP has sustained and will continue to sustain significant damages.

287. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

288. Plaintiffs, on behalf of MGP, have no adequate remedy at law.

**NINTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

289. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

290. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

291. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused MGP to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

292. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

293. Plaintiffs, on behalf of MGP, have no adequate remedy at law.

## TENTH CLAIM
**Against Defendants Colo, Bratcher, and Gall for Contribution Under Sections 10(b) and 21D of the Exchange Act**

294. Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

295. MGP and Defendants Colo, Bratcher, and Gall are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Colo's, Bratcher's, and Gall's willful and/or reckless violations of their obligations as officers and/or directors of MGP.

296. Defendants Colo, Bratcher, and Gall, because of their positions of control and authority as officers and/or directors of MGP, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of MGP, including the wrongful acts complained of herein and in the Securities Class Action.

297. Accordingly, Defendants Colo, Bratcher, and Gall are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

298. As such, MGP is entitled to receive all appropriate contribution or indemnification from Defendants Colo, Bratcher, and Gall.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiffs may maintain this action on behalf of MGP, and that Plaintiffs are adequate representatives of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to MGP;

(c) Determining and awarding to MGP the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing MGP and the Individual Defendants to take all necessary actions to reform and improve MGP's corporate governance and internal procedures to comply with applicable laws and to protect MGP and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of MGP to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding MGP restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiffs the costs and disbursements of this action, including

reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: July 1, 2025

Respectfully Submitted,

**WALTERS, RENWICK, RICHARDS & VAUGHAN, P.C.**

*/s/ Karen Wedel Renwick*
Karen Wedel Renwick (D. Kan. No. 12095)
R. Frederick Walters (D. Kan. No. 70561)
1100 Main Street, Suite 2500
Kansas City, MO 64105
Telephone: (816) 421 -6620
Facsimile: (816) 421-4747
E-mail: krenwick@wrrvlaw.com
Email: fwalters@wrrvlaw.com

*Local Counsel for Plaintiffs Cole Sebald and Bryan Reid*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff Cole Sebald*

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall (*pro hac vice*)
Herbert W. Mondros (*pro hac vice*)
825 East Gate Blvd., Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Facsimile: (302) 654-7530
Email: tjm@rl-legal.com
Email: hwm@rl-legal.com

*Counsel for Plaintiff Bryan Reid*

# VERIFICATION

I, Cole Sebald, am a plaintiff in the within action. I have reviewed the allegations made in this Amended Consolidated Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of June, 2025.

Signed by:
04DF1B3612CC45C...

Cole Sebald

**VERIFICATION**

I, Bryan Reid, have reviewed the allegations made in this Verified Consolidated Amended Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further declare that I am a current holder, and have been a holder, of MGP Ingredients, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: 6/25/2025

Signed by:
Bryan Reid
C4984E808CB04CF...
BRYAN REID